# TRAINOR, DIRECTOR, ILLINOIS DEPARTMENT OF PUBLIC AID, ET AL. *v.* HERNANDEZ ET UX.

No. 75–1407.   Argued January 18, 1977—Decided May 31, 1977

*Paul J. Bargiel,* Assistant Attorney General of Illinois, argued the cause for appellants. With him on the briefs were *William J. Scott,* Attorney General, and *Stephen R. Swofford,* Assistant Attorney General.

*John Dienner III* argued the cause for appellees Finley et al. in support of appellants. With him on the briefs were *Bernard Carey* and *Paul P. Biebel, Jr.*

*Fred L. Lieb* argued the cause for appellees Hernandez et ux. With him on the brief were *Alan Dockterman, James O. Latturner,* and *Sheldon Roodman.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The Illinois Department of Public Aid (IDPA) filed a lawsuit in the Circuit Court of Cook County, Ill., on October 30, 1974, against appellees Juan and Maria Hernandez, alleging that they had fraudulently concealed assets while applying for and receiving public assistance. Such conduct is a crime under Illinois law, Ill. Rev. Stat., c. 23, § 11–21 (1973). The IDPA, however, proceeded civilly and sought only return of the money alleged to have been wrongfully

received. The IDPA simultaneously instituted an attachment proceeding against appellees' property. Pursuant to the Illinois Attachment Act, Ill. Rev. Stat., c. 11 (1973) (Act), the IDPA filed an affidavit setting forth the nature and amount of the underlying claim and alleging that the appellees had obtained money from the IDPA by fraud.[1] The writ of attachment was issued automatically[2] by the clerk of the court upon receipt of this affidavit.[3] The writ

---

[1] Under § 1 of the Act, a writ will issue only upon allegation in the affidavit of one of the following nine grounds:

"First: Where the debtor is not a resident of this State.

"Second: When the debtor conceals himself or stands in defiance of an officer, so that process cannot be served upon him.

"Third: Where the debtor has departed from this State with the intention of having his effects removed from this State.

"Fourth: Where the debtor is about to depart from this State with the intention of having his effects removed from this State.

"Fifth: Where the debtor is about to remove his property from this State to the injury of such creditor.

"Sixth: Where the debtor has within 2 years preceding the filing of the affidavit required, fraudulently conveyed or assigned his effects, or a part thereof, so as to hinder or delay his creditors.

"Seventh: Where the debtor has, within 2 years prior to the filing of such affidavit, fraudulently concealed or disposed of his property so as to hinder or delay his creditors.

"Eighth: Where the debtor is about fraudulently to conceal, assign, or otherwise dispose of his property or effects, so as to hinder or delay his creditors.

"Ninth: Where the debt sued for was fraudulently contracted on the part of the debtor: Provided, the statements of the debtor, his agent or attorney, which constitute the fraud, shall have been reduced to writing, and his signature attached thereto, by himself, agent or attorney."

[2] Under § 2 of the Act, in cases sounding in tort the writ is. not issued until a judge has examined the plaintiff under oath and determined that the damages suffered exceed the amount of the attachment.

[3] Section 2 of the Act provides in part:

"2. Affidavit—Statement—Examination under oath. § 2. To entitle a creditor to such a writ of attachment, he or his agent or attorney shall make and file with the clerk of the circuit court, an affidavit setting forth

was then given to the sheriff who executed it, on November 5, 1974, on money belonging to appellees in a credit union. Appellees received notice of the attachment, freezing their money in the credit union, on November 8, 1974, when they received the writ, the complaint, and the affidavit in support of the writ. The writ indicated a return date for the attachment proceeding of November 18, 1974.[4] Appellees appeared in court on November 18, 1974, and were informed that the matter would be continued until December 19, 1974. Appellees never filed an answer either to the attachment or to the underlying complaint.[5] They did not seek a prompt hear-

the nature and amount of the claim, so far as practicable, after allowing all just credits and set-offs, and any one or more of the causes mentioned in section 1, and also stating the place of residence of the defendants, if known, and if not known, that upon diligent inquiry the affiant has not been able to ascertain the same together with a written statement, either embodied in such affidavit or separately in writing, executed by the attorney or attorneys representing the creditor, to the effect that the attachment action invoked by such affidavit does or does not sound in tort, also a designation of the return day for the summons to be issued in said action."

Since the State was a party, the normal requirement that the plaintiff post a bond in an amount equal to twice the amount sued for, did not apply and no bond was posted. See § 4a of the Act.

[4] Section 6 of the Act provides:

"The writ of attachment required in the preceding section shall be directed to the sheriff (and, for purpose only of service of summons, to any person authorized to serve writs of summons), or in case the sheriff is interested, or otherwise disqualified or prevented from acting, to the coroner of the county in which the suit is commenced, and shall be made returnable on a return day designated by the plaintiff, which day shall not be less than ten days or more than sixty days after its date."

[5] Section 27 of the Act provides:

"The defendant may answer, traversing the facts stated in the affidavit upon which the attachment issued, which answer shall be verified by affidavit; and if, upon the trial thereon, the issue shall be found for the plaintiff, the defendant may answer the complaint or file a motion directed thereto as in other cases, but if found for the defendant, the attachment shall be quashed, and the costs of the attachment shall be adjudged against

ing, nor did they attempt to quash the attachment on the ground that the procedures surrounding its issuance rendered it and the Act unconstitutional. Instead appellees filed the instant lawsuit in the United States District Court for the Northern District of Illinois on December 2, 1974, seeking, *inter alia,* return of the attached money. The federal complaint alleged that the appellees' property had been attached pursuant to the Act and that the Act was unconstitutional in that it provided for the deprivation of debtors' property without due process of law. Appellees as plaintiffs sought to represent a class of those "who have had or may have their property attached without notice or hearing upon the creditor's mere allegation of fraudulent conduct pursuant to the Illinois Attachment Act." App. 6–7. They named as defendants appellants Trainor and O'Malley, officials of the IDPA, and sought declaration of a defendant class made up of all the court clerks in the Circuit Courts of Illinois, and of another defendant class of all sheriffs in Illinois. They sought an injunction against Trainor and O'Malley forbidding them to seek attachments under the Act and an injunction against the clerks and sheriffs forbidding them to issue or serve writs of attachment under the Act. Appellees also sought preliminary relief in the form of an order directing the Sheriff of Cook County to release the property which had been attached. Finally, appellees sought the convening of a three-judge court pursuant to 28 U. S. C. § 2284.

The District Court declined to rule on the request for preliminary relief because the parties had agreed that one-half of the money in the credit union would be returned. A three-judge court was convened. It certified the suit as a plaintiff and defendant class action as appellees had requested. App. 63. In an opinion dated December 19, 1975, almost one year after the return date of the attachment in state court, it

the plaintiff, but the suit shall proceed to final judgment as though commenced by summons."

declined to dismiss the case under the doctrine of *Younger* v. *Harris,* 401 U. S. 37 (1971), and *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592 (1975), stating:

> "In *Huffman,* the State of Ohio proceeded under a statute which gave an exclusive right of action to the state. By contrast, the Illinois Attachment Act provides a cause of action for any person, public or private. It is mere happenstance that the State of Illinois was the petitioner in this attachment proceeding. It is likewise coincidental that the pending state proceedings may arguably be quasi-criminal in nature; under the Illinois Attachment Act, they need not be. These major distinctions preclude this Court from extending the principles of *Younger,* based on considerations of equity, comity and federalism, beyond the quasi-criminal situation set forth in *Huffman."* *Hernandez* v. *Danaher,* 405 F. Supp. 757, 760 (1975).

Proceeding to the merits, it held §§ 1, 2, 2a, 6, 8, 10, and 14 of the Act to be "on [their face] patently violative of the due process clause of the Fourteenth Amendment to the United States Constitution." 405 F. Supp., at 762. It ordered the clerk of the court and the Sheriff of Cook County to return to appellees the rest of their attached property; it enjoined all clerks and all sheriffs from issuing or serving attachment writs pursuant to the Act and ordered them to release any currently held attached property to its owner; and it enjoined appellants Trainor and O'Malley from authorizing applications for attachment writs pursuant to the Act. App. 65–66. Appellants appealed to this Court under 28 U. S. C. § 1253, claiming that under *Younger* and *Huffman* principles the District Court should have dismissed the suit without passing on the constitionality of the Act and that the Act is in any event constitutional.[6] Since we agree with appellants that *Younger* and

---

[6] Appellees argue that the sheriffs and clerks have not perfected their appeals and that the IDPA officials cannot litigate in connection with

*Huffman* principles do apply here, we do not reach their second claim.

Because our federal and state legal systems have overlapping jurisdiction and responsibilities, we have frequently inquired into the proper role of a federal court, in a case pending before it and otherwise within its jurisdiction, when litigation between the same parties and raising the same issues is or apparently soon will be pending in a state court. More precisely, when a suit is filed in a federal court challenging the constitutionality of a state law under the Federal Constitution and seeking to have state officers enjoined from enforcing it, should the federal court proceed to judgment when it appears that the State has already instituted proceedings in the state court to enforce the challenged statute against the federal plaintiff and the latter could tender and have his federal claims decided in the state court?

*Younger* v. *Harris, supra,* and *Samuels* v. *Mackell,* 401 U. S. 66 (1971), addressed these questions where the already pending state proceeding was a criminal prosecution and the federal plaintiff sought to invalidate the statute under which the state prosecution was brought. In these circumstances, the Court ruled that the Federal District Court should issue neither a declaratory judgment nor an injunction but should dismiss the case. The first justification the Court gave for this rule was simply the "basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not

---

*their* appeals the validity of the injunction directing the clerk of the court to return appellees' property in the credit union. The argument is meritless. The IDPA officials were parties below; the order directing the clerk to return the property attached for the benefit of IDPA affects their interests in a vital way; and their ability to obtain review of such an order cannot depend on whether the clerk—over whom IDPA has no control—chooses to perfect his appeal.

suffer irreparable injury if denied equitable relief." *Younger* v. *Harris, supra,* at 43–44.

Beyond the accepted rule that equity will ordinarily not enjoin the prosecution of a crime, however, the Court voiced a "more vital consideration," 401 U. S., at 44, namely, that in a Union where both the States and the Federal Government are sovereign entities, there are basic concerns of federalism which counsel against interference by federal courts, through injunctions or otherwise, with legitimate state functions, particularly with the operation of state courts. Relying on cases that declared that courts of equity should give "scrupulous regard [to] the rightful independence of state governments," *Beal* v. *Missouri Pacific R. Co.,* 312 U. S. 45, 50 (1941), the Court held, that in this intergovernmental context, the two classic preconditions for the exercise of equity jurisdiction assumed new dimensions. Although the existence of an adequate remedy at law barring equitable relief normally would be determined by inquiring into the remedies available in the federal rather than in the state courts, *Great Lakes Co.* v. *Huffman,* 319 U. S. 293, 297 (1943), here the inquiry was to be broadened to focus on the remedies available in the pending state proceeding. " 'The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection.' " *Younger* v. *Harris, supra,* at 45, quoting *Fenner* v. *Boykin,* 271 U. S. 240, 243–244 (1926). Dismissal of the federal suit "naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." *Gibson* v. *Berryhill,* 411 U. S. 564, 577 (1973). "The policy of equitable restraint . . . is founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler* v. *Helfant,* 421 U. S. 117, 124 (1975).

The Court also concluded that the other precondition for equitable relief—irreparable injury—would not be satisfied unless the threatened injury was both great and immediate. The burden of conducting a defense in the criminal prosecution was not sufficient to warrant interference by the federal courts with legitimate state efforts to enforce state laws; only extraordinary circumstances would suffice.[7] As the

[7] See *Kugler* v. *Helfant,* 421 U. S. 117, 124–125 (1975):

"Although the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution alone do not constitute 'irreparable injury' in the 'special legal sense of that term,' [*Younger* v. *Harris,* 401 U. S.,] at 46, the Court in *Younger* left room for federal equitable intervention in a state criminal trial where there is a showing of 'bad faith' or 'harassment' by state officials responsible for the prosecution, *id.,* at 54, where the state law to be applied in the criminal proceeding is ' "flagrantly and patently violative of express constitutional prohibitions," ' *id.,* at 53, or where there exist other 'extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment.' *Ibid.* In the companion case of *Perez* v. *Ledesma,* 401 U. S. 82, the Court explained that '[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.' *Id.,* at 85. See *Mitchum* v. *Foster,* 407 U. S. 225, 230–231.

"The policy of equitable restraint expressed in *Younger* v. *Harris,* in short, is founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights. See *Steffel* v. *Thompson,* 415 U. S. 452, 460. Only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process. The very nature of 'extraordinary circumstances,' of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. [Footnote omitted.] But whatever else is required, such circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation."

Court later explained, to restrain a state proceeding that afforded an adequate vehicle for vindicating the federal plaintiff's constitutional rights "would entail an unseemly failure to give effect to the principle that state courts have the solemn responsibility equally with the federal courts" to safeguard constitutional rights and would "reflec[t] negatively upon the state court's ability" to do so. *Steffel* v. *Thompson*, 415 U. S. 452, 460–461, 462 (1974). The State would be prevented not only from "effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies." *Huffman* v. *Pursue, Ltd.*, 420 U. S., at 604.

*Huffman* involved the propriety of a federal injunction against the execution of a judgment entered in a pending state-court suit brought by the State to enforce a nuisance statute. Although the state suit was a civil rather than a criminal proceeding, *Younger* principles were held to require dismissal of the federal suit. Noting that the State was a party to the nuisance proceeding and that the nuisance statute was "in aid of and closely related to criminal statutes," the Court concluded that a federal injunction would be "an offense to the State's interest in the nuisance litigation [which] is likely to be every bit as great as it would be were this a criminal proceeding." 420 U. S., at 604. Thus, while the traditional maxim that equity will not enjoin a criminal prosecution strictly speaking did not apply to the nuisance proceeding in *Huffman*, the " 'more vital consideration' " of comity, *id.*, at 601, quoting *Younger* v. *Harris*, 401 U. S., at 44, counseled restraint as strongly in the context of the pending state civil enforcement action as in the context of a pending criminal proceeding. In these circumstances, it was proper that the federal court stay its hand.

We have recently applied the analysis of *Huffman* to proceedings similar to state civil enforcement actions—judicial

contempt proceedings. *Juidice v. Vail,* 430 U. S. 327 (1977). The Court again stressed the "more vital consideration" of comity underlying the *Younger* doctrine and held that the state interest in vindicating the regular operation of its judicial system through the contempt process—whether that process was labeled civil, criminal, or quasi-criminal—was sufficiently important to preclude federal injunctive relief unless *Younger* standards were met.

These cases control here. An action against appellees was pending in state court when they filed their federal suit. The state action was a suit by the State to recover from appellees welfare payments that allegedly had been fraudulently obtained. The writ of attachment issued as part of that action. The District Court thought that *Younger* policies were irrelevant because suits to recover money and writs of attachment were available to private parties as well as the State; it was only because of the coincidence that the State was a party that the suit was "arguably" in aid of the criminal law. But the fact remains that the State was a party to the suit in its role of administering its public-assistance programs. Both the suit and the accompanying writ of attachment were brought to vindicate important state policies such as safeguarding the fiscal integrity of those programs. The state authorities also had the option of vindicating these policies through criminal prosecutions. See *supra,* at 435. Although, as in *Juidice,* the State's interest here is "[p]erhaps . . . not quite as important as is the State's interest in the enforcement of its criminal laws . . . or even its interest in the maintenance of a quasi-criminal proceeding . . . ," 430 U. S., at 335, the principles of *Younger* and *Huffman* are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, brought by the State in its sovereign capacity.[8]

***

[8] Title 28 U. S. C. § 2283 provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as

For a federal court to proceed with its case rather than to remit appellees to their remedies in a pending state enforcement suit would confront the State with a choice of engaging in duplicative litigation, thereby risking a temporary federal injunction, or of interrupting its enforcement proceedings pending decision of the federal court at some unknown time in the future. It would also foreclose the opportunity of the state court to construe the challenged statute in the face of the actual federal constitutional challenges that would also be pending for decision before it, a privilege not wholly shared by the federal courts. Of course, in the case before us the

---

expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." The section is not applicable here because this 42 U. S. C. § 1983 action is an express statutory exception to its application, *Mitchum* v. *Foster*, 407 U. S. 225 (1972); but it is significant for present purposes that the section does not discriminate between civil and criminal proceedings pending in state courts. Furthermore, 28 U. S. C. § 1341 provides that district courts shall not enjoin, suspend, or restrain the levy or collection of any tax under state law where there are adequate remedies available in state tribunals.

Prior cases in this Court that at the time counseled restraint in actions seeking to enjoin state officials from enforcing state statutes or implementing public policies, did not necessarily distinguish between the type of proceedings—civil or criminal—pending or contemplated by state officers. *Wilson* v. *Schnettler*, 365 U. S. 381, 384–385 (1961); *Allegheny County* v. *Mashuda Co.*, 360 U. S. 185, 189–190 (1959); *Alabama Public Service Comm'n* v. *Southern R. Co.*, 341 U. S. 341, 349–350 (1951); *Burford* v. *Sun Oil Co.*, 319 U. S. 315, 317–318 (1943); *Great Lakes Co.* v. *Huffman*, 319 U. S. 293, 297–298 (1943); *Brillhart* v. *Excess Ins. Co.*, 316 U. S. 491, 494–495 (1942); *Watson* v. *Buck*, 313 U. S. 387, 400–401 (1941); *Beal* v. *Missouri Pacific R. Co.*, 312 U. S. 45, 49–50 (1941); *Spielman Motor Sales Co.* v. *Dodge*, 295 U. S. 89, 95–97 (1935); *Pennsylvania* v. *Williams*, 294 U. S. 176, 185 (1935); *Hawks* v. *Hamill*, 288 U. S. 52, 60–61 (1933); *Matthews* v. *Rodgers*, 284 U. S. 521, 525–526 (1932); *Massachusetts State Grange* v. *Benton*, 272 U. S. 525, 527 (1926); *Fenner* v. *Boykin*, 271 U. S. 240, 243 (1926).

As in *Juidice* v. *Vail*, 430 U. S. 327, 336 n. 13 (1977), we have no occasion to decide whether *Younger* principles apply to all civil litigation.

state statute was invalidated and a federal injunction pro-
hibited state officers from using or enforcing the attachment
statute for any purpose. The eviscerating impact on many
state enforcement actions is readily apparent.[9] This disrup-
tion of suits by the State in its sovereign capacity, when
combined with the negative reflection on the State's ability
to adjudicate federal claims that occurs whenever a federal
court enjoins a pending state proceeding, leads us to the
conclusion that the interests of comity and federalism on
which *Younger* and *Samuels* v. *Mackell* primarily rest apply
in full force here. The pendency of the state-court action
called for restraint by the federal court and for the dismissal
of appellees' complaint unless extraordinary circumstances
were present warranting federal interference or unless their
state remedies were inadequate to litigate their federal due
process claim.

No extraordinary circumstances warranting equitable relief
were present here. There is no suggestion that the pending
state action was brought in bad faith or for the purpose of
harassing appellees. It is urged that this case comes within
the exception that we said in *Younger* might exist where a

---

[9] Appellees argue that the injunction issued below in no way interfered
with a pending state case. They point to the fact that only the attach-
ment proceeding was interfered with—the underlying fraud action may
continue unimpeded—and claim that the attachment proceeding is not a
court proceeding within the doctrine of *Younger* and *Huffman*. In this
regard they rely on *Lynch* v. *Household Finance Corp.,* 405 U. S. 538
(1972); *Fuentes* v. *Shevin,* 407 U. S. 67 (1972); and *Gerstein* v. *Pugh,*
420 U. S. 103 (1975). None of these cases control here.

In this case the attachment was issued by a court clerk and is very much
a part of the underlying action for fraud. Moreover, the attachment in
this case contained a return date on which the parties were to appear in
*court* and at which time the appellees would have had an opportunity to
contest the validity of the attachment. Thus the attachment proceeding
was "pending" *in the state courts* within the *Younger* and *Huffman* doc-
trine at the time of the federal suit.

state statute is " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' " 401 U. S., at 53–54, quoting *Watson* v. *Buck,* 313 U. S. 387, 402 (1941). Even if such a finding was made below, which we doubt (see *supra,* at 439), it would not have been warranted in light of our cases. Compare *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601 (1975), with *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600 (1974).

As for whether appellees could have presented their federal due process challenge to the attachment statute in the pending state proceeding, that question, if presented below, was not addressed by the District Court, which placed its rejection of *Younger* and *Huffman* on broader grounds. The issue is heavily laden with local law, and we do not rule on it here in the first instance.[10]

The grounds on which the District Court refused to apply the principles of *Younger* and *Huffman* were infirm; it was therefore error, on those grounds, to entertain the action on behalf of either the named or the unnamed plaintiffs and to reach the issue of the constitutionality of the Illinois attachment statute.[11]

The judgment is therefore reversed, and the case is remanded

---

[10] The parties are in disagreement on this issue, the State squarely asserting, and the appellees denying, that the federal due process claim could have been presented and decided in the pending attachment proceeding. MR. JUSTICE STEVENS, in dissent, offers additional reasons—not relied on by appellees and not addressed by the State—for concluding that the state suit did not offer an adequate forum for litigating the federal claim. We do not resolve these conflicting views.

[11] Appellees have argued here that the relief granted in favor of other class members is not barred by *Younger* and *Huffman* because state cases were not pending against some of them. Since the class should never have been certified, we need not address this argument.

to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART substantially agrees with the views expressed in the dissenting opinions of MR. JUSTICE BRENNAN and MR. JUSTICE STEVENS. Accordingly, he respectfully dissents from the opinion and judgment of the Court.

MR. JUSTICE BLACKMUN, concurring.

I join the Court's opinion and write only to stress that the substantiality of the State's interest in its proceeding has been an important factor in abstention cases under *Younger* v. *Harris,* 401 U. S. 37 (1971), from the beginning. In discussing comity, the Court in *Younger* clearly indicated that both federal and state interests had to be taken into account:

> "The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.,* at 44.

Consistently with this requirement of balancing the federal and state interests, the Court in previous *Younger* cases has imposed a requirement that the State must show that it has an important interest to vindicate in its own courts before the federal court must refrain from exercising otherwise proper federal jurisdiction. In *Younger* itself, the Court relied on the State's vital concern in the administration of its criminal laws. In *Huffman* v. *Pursue, Inc.,* 420 U. S. 592 (1975), the

Court stressed the fact that it dealt with a quasi-criminal state proceeding to which the State was a party. The proceeding was both in aid of and closely related to criminal statutes. Thus, the State's underlying policy interest in the litigation was deemed to be as great as the interest found in *Younger.* Similarly, in *Juidice* v. *Vail,* 430 U. S. 327 (1977), the Court found that the State's interest in its contempt procedures was substantial.

In cases where the State's interest has been more attenuated, the Court has refused to order *Younger* abstention. Thus, in *Steffel* v. *Thompson,* 415 U. S. 452 (1974), in which a state prosecution was merely threatened, the federal court was free to reach the merits of the claim for a declaratory judgment. *Id.,* at 462. In such a case, "the opportunity for adjudication of constitutional rights in a federal forum, as authorized by the Declaratory Judgment Act, becomes paramount." *Ellis* v. *Dyson,* 421 U. S. 426, 432 (1975). See generally Kanowitz, Deciding Federal Law Issues in Civil Proceedings: State Versus Federal Trial Courts, 3 Hastings Const. L. Q. 141 (1976).

Application of these principles to the instant case leads me to agree with the Court's order reversing and remanding the case. Like the Court, I am satisfied that a state proceeding was pending. *Ante,* at 444, 446 n. 9. I, too, find significant the fact that the State was a party in its sovereign capacity to both the state suit and the federal suit. *Ante,* at 444. Here, I emphasize the importance of the fact that the state interest in the pending state proceeding was substantial. In my view, the fact that the State had the option of proceeding either civilly or criminally to impose sanctions for a fraudulent concealment of assets while one applies for and receives public assistance demonstrates that the underlying state interest is of the same order of importance as the interests in *Younger* and *Huffman.* The propriety of abstention should not depend on the State's choice to vindicate its interests by a less drastic, and perhaps more lenient,

route. In addition, as the Court notes, the state-court proceeding played an important role in safeguarding the fiscal integrity of the public assistance programs. Since the benefits of the recovery of fraudulently obtained funds are enjoyed by all the taxpayers of the State, it is reasonable to recognize a distinction between the State's status as creditor and the status of private parties using the same procedures.

For me, the existence of the foregoing factors brings this case squarely within the Court's prior *Younger* abstention rulings.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

The Court continues on, to me, the wholly improper course of extending *Younger* principles to deny a federal forum to plaintiffs invoking 42 U. S. C. § 1983 for the decision of meritorious federal constitutional claims when a *civil* action that might entertain such claims is pending in a state court. Because I am of the view that the decision patently disregards Congress' purpose in enacting § 1983—to open federal courts to the decision of such claims without regard to the pendency of such state civil actions—and because the decision indefensibly departs from prior decisions of this Court, I respectfully dissent.

I

An attachment proceeding against appellees' credit union savings was instituted by the Illinois Department of Public Aid (IDPA) under the Illinois Attachment Act simultaneously with the filing of a civil lawsuit in state court for the recovery of public welfare funds allegedly fraudulently obtained. The attachment was initiated when IDPA filled in the blanks on a standard-form "Affidavit for Attachment" stating:

"The defendants *Juan and Maria Hernandez* within two years preceding the filing of this affidavit fraudu-

lently concealed or disposed of property so as to hinder or delay *their* creditors." (Italics indicate matter inserted in blanks by IDPA.) App. 18.

The wording of the affidavit repeats almost verbatim the language of the Illinois Act,[1] and provides no underlying factual allegations upon which a determination can be made whether the conclusion of fraudulent concealment or disposition of property is justified.[2] The writ of attachment was issued as a matter of course by the clerk of the court upon receipt of the affidavit, and the writ was executed on November 5, 1974.

Appellees appeared in state court on the return date, November 18, 1974, and were informed that the hearing on

---

[1] Illinois Rev. Stat., c. 11, § 1 (1973), provides:

"In any court of competent jurisdiction, a creditor having a money claim . . . may have an attachment against the property of his debtor . . . either at the time of instituting suit or thereafter . . . in any one of the following cases:

.        .        .        .

"Seventh: Where the debtor has, within 2 years prior to the filing of such affidavit, fraudulently concealed or disposed of his property so as to hinder or delay his creditors."

[2] In fact, it appears that appellees *had not* "concealed or disposed of property so as to hinder or delay their creditors" even if the allegations of the unsworn attachment complaint are taken as true. The complaint only alleges that they fraudulently concealed personal property in order to obtain public assistance, not that this concealment was undertaken to avoid payment to creditors. If any part of the form affidavit is applicable to appellees, it appears to be § 1 (i), which tracks Ill. Rev. Stat., c. 11, § 1 (Ninth) (1973):

"The debt sued for was fraudulently contracted on the part of the defendant ———— and statements of ———— agent ———— or attorney, which constitute the fraud, have been reduced to writing and ———— signature ———— attached thereto, by ———— sel[f] ———— agent ———— or attorney ————." App. 18.

However, IDPA did not fill in the blanks of this portion of the form, and did not rely on it in seeking the writ of attachment.

the validity of the attachment was continued until December 19, 1974. In the meantime appellees—deprived of the use of their savings—faced pending rent and car repair bills, and past due electricity, gas, and telephone bills. On December 2, appellees filed a complaint under 42 U. S. C. § 1983 in Federal District Court seeking a declaratory judgment and an injunction against enforcement of the Illinois Attachment Act. On December 5, two weeks before the continued state-court hearing, appellees sought a temporary restraining order to release their credit union savings from the custody of the sheriff. The District Court effected an agreement between the parties whereby IDPA agreed to the release of one-half of the attached funds, and accordingly did not act on the motion for the temporary restraining order.[3]

A three-judge District Court was convened. The District Court found that it was not required to abstain from deciding the constitutional merits of appellees' challenge, and enjoined the enforcement of the Act on the ground that the Act was "patently and flagrantly violative of the constitution." *Hernandez* v. *Danaher*, 405 F. Supp. 757, 760 (ND Ill. 1975). This Court reverses and holds that the District Court should have dismissed the suit, thus continuing the course initiated in *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592 (1975), and furthered this Term in *Juidice* v. *Vail*, 430 U. S. 327 (1977), of extending *Younger* principles to pending civil actions.

---

[3] The precise date of the agreement to release half of the attached funds does not appear in the record.

The Court points out that the District Court did not issue its opinion in this case until about one year after the date on which appellees could have had their continued hearing in state court to challenge the validity of the attachment. *Ante*, at 438–439. This is irrelevant since the motion for a temporary restraining order, filed two weeks before the continued hearing in state court, resulted in the agreement to release half of appellees' savings. Thus, as a practical matter, appellees received important relief in the Federal District Court at a time when any relief in state court was highly speculative.

## II

I have already set out at some length the reasons for my disagreement with the Court's extension of *Younger* abstention principles to civil cases, particularly actions under 42 U. S. C. § 1983, *Huffman* v. *Pursue, Ltd., supra,* at 613 (dissenting opinion), *Juidice* v. *Vail, supra,* at 341 (dissenting opinion), and will not repeat them here. The Court suggests that this case, like *Huffman,* involves a statute enacted in aid of the criminal law. In *Huffman,* the State of Ohio brought a statutory nuisance suit in state court to close a theater that had previously been adjudged to have shown obscene films. *Huffman* stated, in words quoted by the Court today, that the nuisance proceeding "was 'in aid of and closely related to criminal statutes.' " *Ante,* at 443. The Court states the precise question in this case to be:

> "[S]hould the federal court proceed to judgment when it appears that the State has already instituted proceedings in the state court to enforce the challenged statute against the federal plaintiff and the latter could tender and have his federal claims decided in the state court?" *Ante,* at 440.

Emphasizing that the State sued in state court to "vindicate important state policies," the Court concludes that "the principles of *Younger* and *Huffman* are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, brought by the State in its sovereign capacity." *Ante,* at 444.

In framing the question and its answer this narrowly, the Court apparently desires once more to leave "for another day" the question of the applicability of *Younger* abstention principles to civil suits generally. *Ante,* at 445 n. 8; *Juidice, supra,* at 345 n. (BRENNAN, J., dissenting); see *Huffman, supra,* at 607. But the Court's insistence that "the interests of comity and federalism on which *Younger* and *Samuels* v. *Mackell*

primarily rest apply in full force here," *ante,* at 446, is the signal that "merely the formal announcement is being postponed," *Juidice, supra,* at 345 n. (BRENNAN, J., dissenting). *Younger* and *Samuels* v. *Mackell,* 401 U. S. 66 (1971), dismissed federal-court suits because the plaintiffs sought injunctions against pending criminal prosecutions. I agreed with those results because "[p]ending state criminal proceedings have always been viewed as paradigm cases involving paramount state interests." *Juidice, supra,* at 345 (BRENNAN, J., dissenting). But abstention principles developed to avoid interfering with state criminal prosecutions are manifestly inapplicable here.

In this case the federal plaintiffs seek an injunction only against the use of statutory attachment proceedings which, properly speaking, are not part of the pending civil suit at all. The relief granted here in no way interfered with or prevented the State from proceeding with its suit in state court. It merely enjoined the use of an unconstitutional mechanism for attaching assets from which the State hoped to satisfy its judgment if it prevailed on the merits of the underlying lawsuit. To say that the interest of the State in continuing to use an unconstitutional attachment mechanism to insure payment of a liability not yet established brings into play "in full force" "all the interests of comity and federalism" present in a state criminal prosecution is simply wrong. *Fuentes* v. *Shevin,* 407 U. S. 67 (1972), a § 1983 suit challenging a prejudgment replevin statute, addressed precisely this point. Since the plaintiffs had not sought "an injunction against any pending or future court proceeding as such . . . [but rather] challenged only the summary extrajudicial process of prejudgment seizure of property," *Fuentes* concluded that *Younger* principles posed no bar to a federal court's granting the relief sought. 407 U. S., at 71 n. 3. See also *Lynch* v. *Household Finance Corp.,* 405 U. S. 538, 554–555 (1972), and *Gerstein* v. *Pugh,* 420 U. S. 103 (1975).

The application of *Younger* principles here is also inappropriate because even in the underlying lawsuit the State seeks only a civil recovery of money allegedly fraudulently received. The Court relies on the State's fortuitous presence as a plaintiff in the state-court suit to conclude that the suit is closely related to a criminal suit, but I am hard pressed to understand why the "mere happenstance," 405 F. Supp., at 760, that the State of Illinois rather than a private party invoked the Attachment Act makes this so. The Court's reliance on the presence of the State here may suggest that it might view differently an attachment under the same Act at the instance of a private party, but no reason is advanced why the State as plaintiff should enjoy such an advantage in its own courts over the ordinary citizen plaintiff.[4] Under any analysis, it seems to me that this solicitousness for the State's use of an unconstitutional ancillary proceeding to a civil lawsuit is hardly compelled by the great principles of federalism, comity, and mutual respect between federal and state courts that account for *Younger* and its progeny.

The principles that give strength to *Younger* simply do not support an inflexible rule against federal courts' enjoining state civil proceedings. *Younger* was justified primarily on the basis of the longstanding rule that "courts of equity . . . particularly should not act to restrain a criminal prosecution." 401 U. S., at 43. A comparably rigid rule against enjoining civil proceedings was never suggested until *Huffman,* for in

---

[4] Even if the presence of the State as a plaintiff in the state-court proceeding is held to be of some significance, I fail to see why the federal courts should accord greater deference to the State's fiscal interest here than to the far more basic function of collecting state taxes. As my Brother Stevens conclusively demonstrates, *post,* at 464–466, the standard applied by the Court today goes well beyond the statutory standard for a federal court's enjoining the collection of taxes, which is predicated only upon a finding of no "plain, speedy and efficient remedy" under state law. 28 U. S. C. § 1341.

civil proceedings it cannot be assumed that state interests of compelling importance outweigh the interests of litigants seeking vindication of federal rights in federal court, particularly under a statute expressly enacted by Congress to provide a federal forum for that purpose. Even assuming that federal abstention might conceivably be appropriate in some civil cases, the transformation of what I must think can only be an exception into an absolute rule crosses the line between abstention and abdication.

When it enacted § 1983, Congress weighed the competing demands of "Our Federalism," and consciously decided to protect federal rights in the federal forum. As we have previously recognized, § 1983 was enacted for the express purpose of altering the federal-state judicial balance that had theretofore existed, and of "offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and the laws of the Nation." *Mitchum* v. *Foster,* 407 U. S. 225, 239 (1972). State courts are, of course, bound to follow the Federal Constitution equally with federal courts, but Congress has clearly ordained, as constitutionally it may, that the federal courts are to be the *"primary* and powerful reliances" for vindicating federal rights under § 1983. *Steffel* v. *Thompson,* 415 U. S. 452, 464 (1974) (emphasis in original). If federal courts are to be flatly prohibited, regardless of the circumstances of the individual claim of violation of federal rights, from implementing this "uniquely federal remedy" because of deference to purported state interests in the maintenance of state civil suits, the Court has "effectively cripple[d] the congressional scheme enacted in § 1983." *Juidice* v. *Vail,* 430 U. S., at 343 (BRENNAN, J., dissenting).

### III

Even assuming, *arguendo,* the applicability of *Younger* principles, I agree with the District Court that the Illinois

Attachment Act falls within one of the established exceptions to those principles. As an example of an "extraordinary circumstance" that might justify federal-court intervention, *Younger* referred to a statute that " 'might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' " 401 U. S., at 53–54, quoting *Watson* v. *Buck,* 313 U. S. 387, 402 (1941). Explicitly relying on this exception to *Younger,* the District Court held that the Illinois Act is "patently and flagrantly violative of the constitution." 405 F. Supp., at 760. The Court holds that this finding is insufficient to bring this case within the *Younger* exception because that exception "might exist where a state statute is 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' 401 U. S., at 53–54, quoting *Watson* v. *Buck,* 313 U. S. 387, 402 (1941). Even if such a finding was made below, which we doubt . . . , it would not have been warranted in light of our cases." *Ante,* at 446–447. I disagree.

Obviously, a requirement that the *Watson* v. *Buck* formulation must be literally satisfied renders the exception meaningless, and, as my Brother Stevens demonstrates, *post,* at 461–464, elevates to a literalistic definitional status what was obviously meant only to be illustrative and nonexhaustive. The human mind does not possess a clairvoyance that can foresee whether "every clause, sentence and paragraph" of a statute will be unconstitutional "in whatever manner and against whomever an effort might be made to apply it." The only sensible construction of the test is to treat the "every clause, etc.," wording as redundant, at least when decisions of this Court make clear that the challenged statute is "patently and flagrantly violative of the Constitution." I thought that

the Court had decided as much in *Kugler* v. *Helfant,* 421 U. S. 117, 124 (1975), in stating that *"Younger* left room for federal equitable intervention in a state criminal trial . . . *where the state law to be applied in the criminal proceeding is 'flagrantly and patently violative of express constitutional prohibitions.'"* (Emphasis supplied.) [5]

Clearly the Illinois Attachment Act is "patently and flagrantly violative of express constitutional prohibitions" under the relevant decisions of this Court. *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601 (1975), struck down a Georgia garnishment statute that permitted the issuance of a writ of garnishment by the court clerk upon the filing of an affidavit containing only conclusory allegations, and under which there was "no provision for an early hearing at which the creditor would be required to demonstrate at least probable cause for the garnishment." *Id.,* at 607. The Illinois Attachment Act is constitutionally indistinguishable from the Georgia statute struck down in *North Georgia Finishing.* As in that case, the affidavit filed here contained only conclusory allegations, which in this case were taken from a preprinted form requiring only that the affiant fill in the names of the persons whose property he wished to attach. Upon the filing of this form affidavit, the court clerk issued the writ of attachment as a matter of course. Far from requiring an "early hearing" at which to challenge the validity of the attachment, the Illinois Act provided that the party seeking the attachment could unilaterally set the return date of the writ at any time from 10 to 60 days from the date of its execution.

---

[5] The quotation, in 421 U. S., at 125 n. 4, of the complete *Buck* sentence was carefully identified in *Kugler* as merely "one example of the type of circumstances that could justify federal intervention. . . ." Curiously, the Court, *ante,* at 442 n. 7, quotes *Kugler*'s abridged formulation, but makes no attempt to explain this reference when it finally applies the "every clause, sentence and paragraph" test as the basis for its decision. *Ante,* at 446–447.

Ill. Rev. Stat., c. 11, § 6 (1973). And, as this case demonstrates, the 60-day interval does not necessarily represent the outer limit for the actual hearing date, for the Illinois court here was willing to grant a 30-day continuance beyond the date provided in the writ of attachment, even though appellees appeared in court on the proper date and wished to go forward with the hearing at that time.

No one could seriously contend that the Illinois Act even remotely resembles that sustained in *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600 (1974), and thus falls within the exception to *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969), *Fuentes* v. *Shevin*, 407 U. S. 67 (1972), and *North Georgia Finishing, supra,* carved out by that case. *W. T. Grant* upheld a Louisiana sequestration statute under which a writ of sequestration was issued only after the filing of an affidavit in which " 'the grounds relied upon for the issuance of the writ clearly appear[ed] from specific facts,' " 416 U. S., at 605. The showing of grounds for the issuance of the writ was made before a judge rather than a court clerk, *id.,* at 606, and the debtor was entitled "immediately [to] have a full hearing on the matter of possession following the execution of the writ," *id.,* at 610. None of those procedural safeguards is provided by the Illinois Act. The three-judge District Court unanimously and correctly concluded that the Act "is on its face patently violative of the due process clause of the Fourteenth Amendment." 405 F. Supp., at 762.

The Court gives only bare citations to *North Georgia Finishing* and *W. T. Grant, ante,* at 447, and declines to discuss or analyze them in even the most cursory manner. These decisions so clearly support the District Court's holding under any sensible construction of the *Younger* exception that the Court's silence, and its insistence upon compliance with the literal wording of *Watson* v. *Buck,* only confirms my conviction that the Court is determined to extend to "state *civil* proceedings generally the holding of *Younger,*" *Huffman* v.

*Pursue, Ltd.*, 420 U. S., at 613, and to give its exceptions the narrowest possible reach.    I respectfully dissent.

MR. JUSTICE STEVENS, dissenting.

Today the Court adds four new complexities to a doctrine that has bewildered other federal courts for several years.[1] First, the Court finds a meaningful difference between a state procedure which is "patently and flagrantly violative of the Constitution" and one that is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it."[2]    Second, the Court holds that an unconstitutional collection procedure may be used by a state agency, though not by others, because there is "a distinction between the State's status as creditor and the status of private parties using the same procedures."[3] Third, the Court's application of the abstention doctrine in this case provides even greater protection to a State when it is proceeding as an ordinary creditor than the statutory protection mandated by Congress for the State in its capacity as a tax collector.    Fourth, without disagreeing with the District Court's conclusion that the Illinois attachment procedure is unconstitutional, the Court remands in order to enable the District Court to decide whether that invalid procedure provides an adequate remedy for the vindication of appellees' federal rights.    A comment on each of these complexities may shed light on the character of the abstention doctrine as now viewed by the Court.

---

[1] See, for example, Judge Pell's search for a synthesizing principle in his article, Abstention—A Primrose Path by Any Other Name, 21 DePaul L. Rev. 926 (1972).

[2] The Court, *ante*, at 447, quotes this excerpt from *Watson* v. *Buck*, 313 U. S. 387, 402, which in turn was quoted in *Younger* v. *Harris*, 401 U. S. 37, 53–54.

[3] See MR. JUSTICE BLACKMUN's concurring opinion, *ante*, at 450.

## I

The District Court found the Illinois attachment procedure "patently and flagrantly violative of the constitution." *Hernandez* v. *Danaher,* 405 F. Supp. 757, 760 (ND Ill. 1975). This Court, on the other hand, writes:

> "It is urged that this case comes within the exception that we said in *Younger* might exist where a state statute is 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' 401 U. S., at 53–54, quoting *Watson* v. *Buck,* 313 U. S. 387, 402 (1941). Even if such a finding was made below, *which we doubt . . . ,* it would not have been warranted in light of our cases." *Ante,* at 446–447 (emphasis added).[4]

Since there is no doubt whatsoever as to what the District Court actually said, this Court's expression of doubt can only refer to its uncertainty as to whether a finding that the crux of the statute is patently and flagrantly unconstitutional is sufficient to satisfy the requirement that the statute be patently and flagrantly unconstitutional "in every clause, sentence and paragraph . . . ." It is, therefore, appropriate to consider what is left of this exception to the *Younger* doctrine after today's decision.

The source of this exception is the passage Mr. Justice Black had written some years earlier in *Watson* v. *Buck,* 313 U. S. 387, 402, a case which involved a complicated state antitrust Act. On the basis of its conclusion that certain sections were unconstitutional, a three-judge District Court had en-

---

[4] The cavalier statement that a finding of obvious unconstitutionality would not have been warranted by prior cases simply ignores the careful analysis of the serious defects in the Illinois statute identified in the opinion of the District Court, 405 F. Supp., at 760–762, and in MR. JUSTICE BRENNAN's dissenting opinion.

joined enforcement of the entire Act.[5]   This Court reversed, holding: first, that the invalidity of a part of a statute would not justify an injunction against the entire Act; and second, that in any event the eight sections in question were valid.

In his explanation of the first branch of the Court's holding, Mr. Justice Black pointed out that there are few, if any, statutes that are totally unconstitutional in every part.[6] Since *Watson* involved a new statute which had not been construed by any state court, and since such construction might have affected its constitutionality, Mr. Justice Black's comment emphasized the point that an untried state statute should not be invalidated by a federal court before the state court has an opportunity to construe it.   This consideration is not present in a case involving an attack on a state statute that has been in use for more than a century.   Nothing in *Watson* implies that a limited injunction against an invalid portion of a statute of long standing would be improper.

When he wrote the Court's opinion in *Younger* v. *Harris*, 401 U. S. 37, Mr. Justice Black quoted the foregoing excerpt from the *Watson* case as an example of a situation in which it would be appropriate for a federal court to enjoin a pending

---

[5] The Florida legislation involved in *Watson* v. *Buck* regulated the business of persons holding music copyrights and declared certain combinations of such persons illegal as in restraint of trade.   A three-judge District Court held that 8 sections of that statute conflicted with the federal copyright laws and, without considering the validity of the remaining 13 sections, enjoined enforcement of all 21 sections.

[6] "Passing upon the possible significance of the manifold provisions of a broad statute in advance of efforts to apply the separate provisions is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case.   It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it."   313 U. S., at 402.

state criminal prosecution.[7]   He did not, however, imply that his earlier language rigidly defined the boundaries of one kind of exception from the equitable rationale underlying the *Younger* decision itself.

Today the Court seems to be saying that the "patently and flagrantly unconstitutional" exception to *Younger*-type abstention is unavailable whenever a statute has a legitimate title, or a legitimate severability clause, or some other equally innocuous provision.   If this is a fair reading of the Court's opinion, the Court has given Mr. Justice Black's illustrative language definitional significance.   In effect, this treatment preserves an illusion of flexibility in the application of a *Younger*-type abstention, but it actually eliminates one of the exceptions from the doctrine.   For the typical constitutional attack on a statute focuses on one, or a few, objectionable features.   Although, as Mr. Justice Black indicated in *Watson,* it is conceivable that there are some totally unconstitutional statutes, the possibility is quite remote.   More importantly, the Court has never explained why all sections of any statute must be considered invalid in order to justify an injunction against a portion that is itself flagrantly unconstitutional.   Even if this Court finds the constitutional issue less clear than did the District Court, I do not understand what governmental

---

[7] "There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment.   For example, as long ago as the *Buck* case, *supra,* we indicated:

" 'It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.'   313 U. S., at 402.

"Other unusual situations calling for federal intervention might also arise, but there is no point in our attempting now to specify what they might be."   401 U. S., at 53–54.

interest is served by refusing to address the merits at this stage of the proceedings.

## II

The Court explicitly does not decide "whether *Younger* principles apply to all civil litigation." *Ante,* at 445 n. 8. Its holding in this case therefore rests squarely on the fact that the State, rather than some other litigant, is the creditor that invoked the Illinois attachment procedure. This rationale cannot be tenable unless principles of federalism require greater deference to the State's interest in collecting its own claims than to its interest in providing a forum for other creditors in the community. It would seem rather obvious to me that the amount of money involved in any particular dispute is a matter of far less concern to the sovereign than the integrity of its own procedures. Consequently, the fact that a State is a party to a pending proceeding should make it *less* objectionable to have the constitutional issue adjudicated in a federal forum than if only private litigants were involved. I therefore find it hard to accept the Court's contrary evaluation as a principled application of the majestic language in Mr. Justice Black's *Younger* opinion.

## III

The State has a valid interest in collecting taxes or other obligations. In recognition of that need and in a desire to minimize federal interference with state matters, Congress has provided that a federal court may not enjoin the collection of state taxes if the taxpayer has a "plain, speedy and efficient remedy" under state law.[8] Congress has not, however, placed any restriction on the power of a federal court to decide whether the taxpayer's remedy is, in fact, plain, speedy, and efficient.[9] Quite the contrary, by qualifying the prohibition

---

[8] 28 U. S. C. § 1341.

[9] Indeed, that kind of determination is routine business in a federal court. See, *e. g., Tully* v. *Griffin, Inc.,* 429 U. S. 68.

against enjoining the collection of state taxes, Congress has actually directed the federal courts to review the adequacy of a taxpayer's remedies.

Moreover, the Court has repeatedly held that when a state remedy is uncertain, the federal court must provide relief. As Mr. Justice Holmes put it, "we ought not to leave the plaintiffs to a speculation upon what the State Court might say if an action at law were brought." *Wallace* v. *Hines*, 253 U. S. 66, 68.[10]

The doctrine in *Younger* developed from the same equitable principles that have been applied to interpret 28 U. S. C. § 1341.[11] In cases in which this Court has been confronted

---

[10] See *Hopkins* v. *Southern Cal. Tel. Co.*, 275 U. S. 393, 400; *Mountain States Power Co.* v. *Public Service Comm'n of Montana*, 299 U. S. 167, 170 ("A 'plain, speedy, and efficient remedy' cannot be predicated upon a problematical outcome of future consideration"); *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 106. As Mr. Justice Douglas wrote: "[T]here is such uncertainty concerning the [state] remedy as to make it speculative . . . whether the State affords *full protection to the federal rights.*" *Hillsborough* v. *Cromwell*, 326 U. S. 620, 625 (emphasis added), cited with approval just this Term in *Tully* v. *Griffin, Inc., supra*, at 76. In *Hillsborough*, this Court decided in the first instance that the state remedies were uncertain to the extent of being inadequate. Finally, in *Shaffer* v. *Carter*, 252 U. S. 37, 48, this Court held that even though state procedures might be adequate to remedy the federal question as to the validity of the tax, there were no procedures to remedy the federal wrong in connection with the tax-collection procedures. "Hence, on this ground at least, resort was properly had to equity for relief; and since a court of equity does not 'do justice by halves,' and will prevent, if possible, a multiplicity of suits, the jurisdiction extends to the disposition of all questions raised by the bill." *Ibid.*

[11] The equitable principles relied upon in *Younger* are of ancient vintage. In the first Judiciary Act of 1789 Congress directed that equity be withheld if a "plain, adequate and complete remedy may be had at law." In *Scott* v. *Neely*, 140 U. S. 106, 110, this Court noted that Congress' prohibition was

"declaratory of the rule obtaining and controlling in equity proceedings from the earliest period in England, and always in this country. And so

with that statutory restriction, it has not been reluctant to decide in the first instance whether a state remedy is adequate. Congress has provided no special protection from federal interference for a state agency suing to collect nontax obligations. Equitable considerations (as well as considerations of comity and federalism) do preclude unwarranted interference with litigation brought by such an agency, but surely the agency is entitled to no greater protection than the state tax collector. Nevertheless, the Court is now fashioning a nonstatutory abstention doctrine which requires even greater deference to the State as an ordinary litigant than Congress regarded as appropriate for the State's more basic fiscal needs.

## IV

The Court's decision to remand this litigation to the District Court to decide whether the Illinois attachment pro-

---

it has been often adjudged that whenever, respecting any right violated, a court of law is competent to render a judgment affording a plain, adequate and complete remedy, the party aggrieved must seek his remedy in such court, not only because the defendant has a constitutional right to a trial by jury, but because of the prohibition. of the act of Congress to pursue his remedy in such cases in a court of equity."

One of the major cases relied upon by the Court, *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S. 293, 299, held that although Congress in § 1341 had not specifically prohibited declaratory judgments concerning the validity of state statutes, nonetheless, equitable principles required the same result.

"[W]e find it unnecessary to inquire whether the words of the statute may be so construed as to prohibit a declaration by federal courts concerning the invalidity of a state tax. For we are of the opinion that those considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure." 319 U. S., at 299.

This pronouncement has been read as prohibiting declaratory judgments to the same extent as injunctive suits under § 1341. *Illinois Central R. Co.* v. *Howlett,* 525 F. 2d 178 (CA7 1975) (Sprecher, J.).

cedure provides a debtor with an appropriate forum in which to challenge the constitutionality of the Illinois attachment procedure is ironic. For that procedure includes among its undesirable features a set of rules which effectively foreclose any challenge to its constitutionality in the Illinois courts.

Although it is true that § 27 of the Illinois Attachment Act, Ill. Rev. Stat., c. 11, § 27 (1973), allows the defendant to file a motion to quash the attachment, the purpose of such a motion is to test the sufficiency and truth of the facts alleged in the affidavit or the adequacy of the attachment bond. Section 28 of the Act precludes consideration of any other issues.[12] Even if—contrary to a fair reading—the statute might be construed to allow consideration of a constitutional challenge on a motion to quash, a trial judge may summarily reject such a challenge without fear of reversal; for an order denying such a motion is interlocutory and nonappealable.[13] The ruling on the validity of an attachment does not become final until the underlying tort or contract claim is resolved. At that time the attachment issue will, of course, be moot because the prevailing party will then be entitled to the property regardless of the validity of the attachment.

Because it is so clear that the proceeding pending in the state court did not afford the appellees in this case an ade-

---

[12] Section 28, Ill. Rev. Stat., c. 11, § 28 (1973), provides that "[n]o writ of attachment shall be quashed, nor the property taken thereon restored, . . . if the plaintiff . . . shall cause a legal and sufficient affidavit or attachment bond to be filed, or the writ to be amended, . . . and in that event the cause shall proceed as if such proceedings had originally been sufficient." Thus, under § 28 the only valid question raised in a proceeding concerning the attachment is whether the facts pleaded in the affidavit or writ were true. And, of course, § 28 allows amendment of any improperly pleaded writ or affidavit.

[13] Smith v. Hodge, 13 Ill. 2d 197, 148 N. E. 2d 793 (1958); Brignall v. Merkle, 296 Ill. App. 250, 16 N. E. 2d 150 (1938); Rabits v. Live Oak, Perry & Gulf R. Co., 245 Ill. App. 589 (1927); American Mortgage Corp. v. First National Mortgage Corp., 345 F. 2d 527, 528 (CA7 1965).

quate remedy for the violation of their federal constitutional rights,[14] the Court's disposition points up the larger problem confronting litigants who seek to challenge any state pro-

---

[14] In the present case, the appellees appeared on the return date of the writ of attachment, November 18, 1974 (10 days after their property had been attached), and "were informed that the matter would be continued until December 19, 1974," *ante*, at 437, 31 days later. As the opinion below points out, the person who sues out the writ of attachment has absolute discretion under § 6 of the Act, Ill. Rev. Stat., c. 11, § 6 (1973), to set the return date of the writ of attachment anywhere from 10 to 60 days after the property has been attached. 405 F. Supp., at 762. The return date appears to be the first chance an attachment can be challenged; and as this case points up, the proceedings on the return date can be summarily continued for at least a month if not longer. Thus, property may well be attached for three months or longer before even a § 27 motion will be entertained.

As the court below also noted, "[s]ection 27 . . . does not give defendant an absolute right to a hearing on the attachment issue immediately after seizure." 405 F. Supp., at 762. Indeed, the Attachment Act contains no provision for a prompt hearing on the validity of the attachment. This should be compared with § 29 of the Act, Ill. Rev. Stat., c. 11, § 29 (1973), which requires "the court [to] immediately . . . direct a jury to be impaneled to inquire into the right of the property" in cases in which a person *other than the defendant* claims an interest in the property being attached. This deference to the needs for prompt action in response to an interpleading claimant signifies the general lax attitude the Act takes with regard to the rights of persons whose property has been attached.

The Court states that the appellees (who appeared on the return date "and were informed that the matter would be continued" for a month) "did not seek a prompt hearing, nor did they attempt to quash the attachment on the ground that the procedures surrounding its issuance rendered it and the Act unconstitutional." *Ante*, at 437–438. The State suggests that § 26 of the Act, Ill. Rev. Stat., c. 11, § 26 (1973), allows appellees to make an appropriate motion that the attachment statute is unconstitutional. However, § 26 provides that "provisions of the Civil Practice Act . . . shall apply to all proceedings hereunder, *except as otherwise provided in this Act*." (Emphasis added.) As we note in our discussion of § 28, *supra*, the statute does not authorize raising unconstitutionality as a defense to an attachment.

The State also cites Ill. Sup. Ct. Rule 184, which provides that a party

cedure as violative of the Due Process Clause of the Fourteenth Amendment.

As I suggested in my separate opinion in *Juidice* v. *Vail,* 430 U. S. 327, 339, a principled application of the rationale of *Younger* v. *Harris,* 401 U. S. 37, forecloses abstention in cases in which the federal challenge is to the constitutionality of the state procedure itself.[15]   Since this federal plaintiff raised

---

may "call up a motion for disposition before or after" the time for its normal disposition. This, however, does not provide a prompt hearing; it only allows appellees to ask for one. The request may or may not be granted in the discretion of the court. Neither § 26 nor Rule 184 assures appellees a prompt hearing, and neither overrides the fact that § 28 appears to foreclose any defense of unconstitutionality in attacking an attachment.

[15] There should be no abstention unless the state procedure affords a plain, speedy, and efficient remedy for the federal wrong; indeed, the opinion in *Younger* in basing its decision on basic equity principles acknowledges this as the fundamental requirement in application of the abstention doctrine. The majority opinion in this case states the question presented as whether abstention is proper when a "State has already instituted proceedings . . . and the [appellees] could tender and have [their] federal claims decided in the state court." *Ante,* at 440. It then proceeds to quote from numerous cases requiring an adequate state remedy for application of the abstention doctrine. *Younger* v. *Harris,* 401 U. S. 37, 45, quoting *Fenner* v. *Boykin,* 271 U. S. 240, 243–244 (requiring the federal plaintiff to "first set up and rely on his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection"); *Gibson* v. *Berryhill,* 411 U. S. 564, 577 (dismissal of the federal suit as "naturally presuppos[ing] the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved"); *Kugler* v. *Helfant,* 421 U. S. 117, 124 (abstention founded "on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights"). *Ante,* at 441. In my judgment, when a state procedure is challenged, an adequate forum must be one that is sufficiently independent of the alleged unconstitutional procedure to judge it impartially and to provide prompt relief if the procedure is found wanting. No Illinois procedure has been pointed to as providing such relief, and where the remedy is "uncertain," federal jurisdiction exists.

a serious question about the fairness of the Illinois attachment procedure, and since that procedure does not afford a plain, speedy, and efficient remedy for his federal claim, it necessarily follows that *Younger* abstention is inappropriate.

Thirty years ago Mr. Justice Rutledge characterized a series of Illinois procedures which effectively foreclosed consideration of the merits of federal constitutional claims as a "procedural labyrinth . . . made up entirely of blind alleys." *Marino* v. *Ragen,* 332 U. S. 561, 567. Today Illinois litigants may appropriately apply that characterization to the Court's increasingly Daedalian doctrine of abstention.

I respectfully dissent.