**CASA MARIE, INC., et al.,
Plaintiffs, Appellees,**

v.

**SUPERIOR COURT OF PUERTO RICO
for the DISTRICT OF ARECIBO, et
al., Defendants, Appellants.**

**CASA MARIE, INC., et al.,
Plaintiffs, Appellees,**

v.

**SUPERIOR COURT OF PUERTO RICO
for the DISTRICT OF ARECIBO, et
al., Defendants, Appellees,**

**Esther Rivera Santos, et al.,
Defendants, Appellants.**

**Nos. 91–1053, 91–1054.**

United States Court of Appeals,
First Circuit.

Heard March 2, 1992.

Decided March 9, 1993.

Anabelle Rodriguez Rodriguez, Deputy Sol. Gen., with whom Jorge E. Perez Diaz, Sol. Gen., was on brief for defendant, appellant Superior Court of Puerto Rico for the Dist. of Arecibo.

Ramon L. Walker Merino with whom Angel M. Bonnet Rosario was on brief for defendants, appellants Rivera Santos, et al.

William Ramirez–Hernandez with whom Nora Vargas–Acosta was on brief for plaintiffs, appellees.

Carlos E. Vega–Perez with whom Juan Francisco Correa–Luna, Puerto Rico Legal Services Corp., Kim Savage, Jeanne Finberg and National Senior Citizens Law Center were on brief for intervenors-appellees.

Before BREYER, Chief Judge, FEINBERG,* Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Appellants, neighbors in the Jardines de Arecibo housing development ("JDA") in Arecibo, Puerto Rico ("neighbors"), and the Superior Court of Puerto Rico for the District of Arecibo ("Superior Court"), appeal from an order of the United States District Court for the District of Puerto Rico permanently enjoining enforcement of a final judgment of the Superior Court mandating the immediate closure of Casa Marie, Hogar Geriatrico, Inc. ("Casa Marie"), a live-in, elder-care facility located in the JDA. The Superior Court judgment was based on a determination that Casa Marie was operating in violation of local zoning ordinances and JDA restrictive covenants. Appellees, the owners and operators of Casa Marie, and fourteen of its elderly and handicapped residents, instituted the federal action to enjoin enforcement of the Superior Court judgment. The federal district court ruled that the neighbors' resort to the Commonwealth courts to close Casa Marie violated the federally protected rights of Casa Marie residents under 42 U.S.C. § 1983 ("section 1983") and the Fair Housing Act, 42 U.S.C. § 3604 ("Title VIII" or "FHA").

# I

## BACKGROUND

A. *The Opening and Expansion of Casa Marie.*

The Jardines de Arecibo housing development was established in 1967. Each property in the development is subject to restrictive covenants allowing only detached single-family residences, prohibiting uses or offensive activities constituting a "nuisance," and requiring prior approval of all construction and alterations. On April 25, 1986, Casa Marie, a live-in facility for elderly handicapped persons, was established by Maria Pla Placencio on a dead-end street in a section of JDA zoned residential (R–3). The R–3 zoning classification allows one and two-family residences, rowhouses, or apartment buildings; elder-care facilities are not allowed except as a variance.

On May 7, 1986, Casa Marie applied to the Department of Social Services ("DSS") for a license to operate an elder-care facility in two single-family residences located on adjacent Lots 19 and 20. The minimum DSS licensure requirements included endorsements from the fire, police, and health departments,[1] and a valid variance permit from the Administracion de Reglamentos y Permisos ("A.R.P.E."), the agency authorized to oversee and administer local zoning laws. On May 21, 1986, A.R.P.E. granted Casa Marie a variance permit, and on February 4, 1987, Casa Marie was granted a six-month provisional DSS license to operate an elder-care facility on Lots 19 and 20, pending full compliance with all other licensing requirements. When its provisional DSS license lapsed in August 1987, Casa Marie was denied a permanent DSS license due in part to the discovery that the A.R.P.E. variance permit might be applicable to Lot 19 only. DSS nevertheless allowed Casa Marie to continue to operate under DSS supervision.

During 1987, the Casa Marie owners began to expand operations, incorporating a third single-family residence, on Lot 21, by constructing wheelchair ramps connecting the buildings on Lots 19, 20 and 21.[2] The owners did not seek or secure the required A.R.P.E. construction permits for these renovations. On January 21, 1988, several Casa Marie neighbors filed an administrative complaint with A.R.P.E., pursuant to P.R. Laws Ann. tit. 23, §§ 71x, 72 (1987),[3]

---

* Of the Second Circuit, sitting by designation.

1. As these endorsements were not seriously at issue, either in the Commonwealth courts or the federal court, we do not address them on appeal.

2. By December 1987, the resident population of Casa Marie had increased from two to twenty-six.

3. Section 71x authorizes A.R.P.E. to issue orders to "cease and desist so that necessary preventative or control measures [can] be taken to achieve the purposes of this chapter...." P.R. Laws Ann. tit. 23, § 71x (1987). Section 72 provides, in pertinent part:

 The Administrator or the Secretary of Justice in those cases where he is requested to do so

requesting that A.R.P.E. order Casa Marie to cease all construction and that A.R.P.E. institute judicial action to compel Casa Marie to demolish the unauthorized structures.

## B. *The Superior Court Judgment and Appeal.*

On April 18, 1988, while their administrative action was pending before A.R.P.E., the neighbors filed a complaint in the Superior Court against Casa Marie and its owners, alleging violations of the zoning ordinances and the JDA restrictive covenants. The neighbors requested injunctive relief requiring demolition of the inter-building renovations and a cessation of all operations. The A.R.P.E. and Superior Court actions were consolidated in the Superior Court.[4]

In May 1988, in order to remedy its zoning violations, Casa Marie submitted a proposal to A.R.P.E. whereby Lots 19, 20 and 21 would be "grouped" into one property for zoning purposes.

On July 14, 1988, however, the Superior Court entered judgment against Casa Marie, finding, *inter alia,* that

(1) Casa Marie violated local zoning laws by its failure to obtain a valid variance permit for Lot 21, and valid construction permits for the renovations on Lots 19, 20 and 21;

(2) Casa Marie was engaged in a "commercial-institutional" use, not a "residential use" as required by the covenants;

(3) Increased levels of traffic and noise in the neighborhood, and the neighbors' fears of "disturbing" the elderly residents, whom they considered "strangers in the neighborhood," had "creat[ed] a dislocation or disorder in the lifestyle of the residential area" which constituted a "nuisance" under the restrictive covenants;

(4) Certain businesses located in JDA's R-3 zone—for example, a medical office and a day-care nursery—also violated the restrictive covenants, but those violations were insufficient to extinguish the covenants under the equitable doctrine of "changed circumstances"; and

(5) Even if A.R.P.E. were to permit a variance for Casa Marie in the future, thereby excusing its past zoning violations, A.R.P.E. was without authority under Puerto Rico law to supersede or excuse Casa Marie's coincident violations of the restrictive covenants.

The Superior Court ordered immediate cessation of the unauthorized operations at Casa Marie, demolition of the unauthorized renovations within four months, and notification of the closure of the elder-care facility to all Casa Marie residents.

Upon notification of the Superior Court judgment, A.R.P.E. suspended action on the Casa Marie "lot grouping" proposal. Without an A.R.P.E. permit, Casa Marie was ineligible for a permanent DSS operating license.

On September 9, 1989, in their appeal of the Superior Court judgment to the Supreme Court of Puerto Rico, the Casa Marie owners alleged, for the first time, that the neighbors had discriminated against Casa Marie's handicapped residents under the Puerto Rico Bill of Rights for Aged Persons. *See* P.R. Laws Ann. tit. 8, §§ 341–347, 343(b) (1987) ("All aged persons shall be entitled to ... live in a dignified environment that satisfies their basic housing ... needs"; authorizing aged persons to bring a "priority" private cause of action in Commonwealth courts). The Supreme Court of Puerto Rico affirmed the Superior Court judgment in November

---

in behalf of the People of Puerto Rico, or any owner or occupant of any neighboring property who is or may be particularly harmed by any such violations may, in addition to the other remedies provided by law, institute injunctions, mandamus or abatement proceedings or other appropriate action to prevent, enjoin, abate, vacate, remove or demolish any building erected or any building or use made or maintained ... in violation of this chapter....
*Id.* § 72.

4. A.R.P.E. issued a "cease and desist" order on May 31, 1988, preventing further renovations, but refrained from directing demolition.

1989.[5]

### C. *The Enforcement and Contempt Proceedings.*

 Casa Marie continued to operate. The neighbors requested a hearing to compel compliance with the Superior Court judgment. At the Superior Court hearing on August 15, 1990, the Casa Marie owners unsuccessfully attempted to interpose Title VIII claims, presumably in behalf of the residents. On October 2, 1990, Legal Services Corporation ("Legal Services") filed a motion to intervene in the Superior Court enforcement proceedings in behalf of five Casa Marie residents ("intervenors"). At the same time, Legal Services brought an independent action in behalf of the intervenors, asserting claims under section 3604 of the FHA,[6] the Puerto Rico Bill of Rights for Aged Persons, and 42 U.S.C. § 1983. The intervenors' section 1983 claims alleged that the Superior Court had acted *in concert* with the neighbors to deprive Casa Marie residents of their civil rights under the Constitution and laws of the United States.

On October 9, 1990, the Superior Court issued a civil contempt decree in the neighbors' enforcement proceedings, ordering the arrest and imprisonment of Casa Marie's owners in the event they failed to comply with its final judgment by November 5, 1990.

---

**5.** Casa Marie filed a motion to set aside the judgment, which the Superior Court denied on March 28, 1990.

**6.** Section 3604(f)(1) of Title VIII makes it unlawful

> [t]o discriminate in the sale or rental, *or to otherwise make unavailable or deny,* a dwelling to any buyer or renter because of a handicap of—
>
> (A) that buyer or renter,
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1) (emphasis added). Section 3617 further provides that

> [i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [sections 3603, 3604, 3605, or 3606].

42 U.S.C. § 3617.

Plaintiffs appear to have stated a *prima facie* case under Title VIII. *See Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211–12, 93 S.Ct. 364, 367–68, 34 L.Ed.2d 415 (1972) (FHA *broadly* construed to effectuate its remedial purpose to foster "truly integrated and balanced living patterns") (quoting 114 Cong. Rec. 3422 (1968)). Title VIII may afford protection to elderly persons who are, or are perceived as, "persons of a handicap." *See* 42 U.S.C. § 3602(h) (defining "handicap" as: (1) "a physical or mental impairment which substantially limits one or more of [a] person's major life activities," (2) "a record of having such an impairment," or (3) "being regarded as having such an impairment"). Title VIII may proscribe discriminatory acts by persons who are neither sellers nor lessors of property. *See Edwards v. Johnson County Health Dep't,* 885 F.2d 1215, 1221 n. 14 (4th Cir.1989); *Evans v. Tubbe,* 657 F.2d 661, 663 (5th Cir.1981). The phrase "otherwise make unavailable or deny" encompasses a wide array of housing practices, *see, e.g., South–Suburban Hous. Ctr. v. Greater South–Suburban Bd. of Realtors,* 935 F.2d 868, 882 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992), and specifically targets the discriminatory use of zoning laws and restrictive covenants. *See* H.R.Rep. No. 711, 2d Cong., 22 (1988), U.S. Code Cong. & Admin. News 1988, pp. 2173, 2183 ("Act is intended to prohibit the application of special requirements through land use regulations [and] restrictive covenants...."); *see also Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 933, 935 (2d Cir.1988); *Rhodes v. Palmetto Pathway Homes, Inc.,* 303 S.C. 308, 400 S.E.2d 484, 486 (1991). Finally, Casa Marie may qualify as a "dwelling." *See* 42 U.S.C. § 3602(b) ("dwelling" defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof"); *id.* § 3602(c) ("family" may mean a "single individual"); *United States v. Columbus Country Club,* 915 F.2d 877, 881 (3d Cir.1990) (defining FHA "residence" as " 'a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit' ") (citation omitted), *cert. denied,* —— U.S. ——, 111 S.Ct. 2797, 115 L.Ed.2d 971 (1991); *but cf.* 42 U.S.C. § 3607(b)(1) (providing that "[n]othing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling"); *Elliott v. City of Athens, Georgia,* 960 F.2d 975 (11th Cir.1992).

On October 23, a different Superior Court judge allegedly expressed ("off the record") reluctance to address intervenors' belated initiatives to stave off the contempt proceedings against Casa Marie for refusing to comply with the Superior Court's final judgment mandating closure. Nevertheless, no order was entered disposing of the motion to intervene or the newly filed Superior Court lawsuit.

### D. *The Federal District Court Action.*

Three days later, on October 26, a complaint was filed in the federal district court by Casa Marie, its owners, and nine other residents (hereinafter "nonintervenors"). The complaint alleged that the neighbors and the Superior Court had acted in concert to enforce the zoning ordinances and the JDA restrictive covenants in a discriminatory manner—in violation of the Equal Protection Clause of the United States Constitution, and Title VIII—in order to deprive the elderly handicapped residents of their right to live in an integrated community. The complaint requested injunctive relief, compensatory and punitive damages, and attorney fees.

The district court allowed Legal Services and the five would-be Superior Court intervenors to intervene in the federal court action. After a four-day hearing, the district court determined that the neighbors had violated section 1983 and FHA sections 3604(f) and 3617 by resorting to the courts of the Commonwealth to enforce the relevant zoning ordinances and restrictive covenants as a means of effecting a discriminatory eviction of the elderly handicapped Casa Marie residents from the neighborhood. *See Casa Marie v. Superior Court of Puerto Rico for District of Arecibo,* 752 F.Supp. 1152, 1167–69 (D.P.R.1990). The district court permanently enjoined the neighbors from executing their Superior Court judgment and the Superior Court contempt decree. The neighbors and the Superior Court appealed.

## II

## DISCUSSION

The neighbors advance three contentions on appeal: first, the district court improp-erly rejected their affirmative defenses based on res judicata, collateral estoppel and the statute of limitations; second, appellees failed to sustain their burden of proof on the section 1983 and Title VIII claims; and third, under the Anti–Injunction Act and the *Younger* abstention doctrine, the district court improperly enjoined the pending Superior Court enforcement and contempt proceedings. We need not confront the entire panoply of appellants' arguments, however, as we conclude that (1) appellees' section 1983 claims should have been dismissed, and (2) their Title VIII claims should not have been entertained by the district court since the pending Superior Court proceedings would afford plaintiffs an adequate forum.

### A. *The Section 1983 Claims.*

The neighbors contend on appeal that the residents failed to establish an essential element of their section 1983 claims; namely that the neighbors acted "under color of state law" by resorting to the Commonwealth courts to enforce the restrictive covenants against Casa Marie. Relying on *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the district court concluded that the neighbors' resort to the Commonwealth judicial system to enforce the JDA restrictive covenants in a discriminatory manner met the "state action" requirement under section 1983. *Casa Marie,* 752 F.Supp. at 1166.

There are two components to the "state action" requirement:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966) ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [section 1983]. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents."). It is obvious, nonetheless, that something more than mere resort to a state court is required to transform the moving party into "a co-conspirator or a joint actor with the judge." *Dennis v. Sparks,* 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *see also Lugar,* 457 U.S. at 937, 102 S.Ct. at 2753; *McDougald v. Jenson,* 786 F.2d 1465, 1488–89 (11th Cir.), *cert. denied,* 479 U.S. 860, 107 S.Ct. 207, 93 L.Ed.2d 137 (1986). Appellees advance two grounds for finding the requisite "state action" in the present case.[7]

1. Corruption, Conspiracy, Usurpation, or Collusion.

▅ An actual conspiracy between a state court and a party attempting a plainly prohibited act would constitute "state action." *Cf. Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150–52, 90 S.Ct. 1598, 1604–06, 26 L.Ed.2d 142 (1970). The residents contend that the Superior Court judge improperly abandoned his judicial role by permitting the neighbors to draft the final judgment against Casa Marie, contrary to the normal practice in Commonwealth courts. The neighbors counter that they merely *transcribed* the court's *ore tenus* ruling at its request. As the district court made no findings of fact on the residents' conspiracy allegation, and no uncontroverted record evidence supports it, we decline to credit their conclusory allegation as a sufficient basis for finding "state action" in these circumstances. *See, e.g., Schucker v.*

*Rockwood,* 846 F.2d 1202, 1205 (9th Cir.) (conclusory allegations of conspiracy between court and litigants insufficient to establish "state action"), *cert. denied,* 488 U.S. 995, 109 S.Ct. 561, 102 L.Ed.2d 587 (1988).

2. Neutrality and the Use of Courts to Enforce Restrictive Covenants.

The residents argue, in the alternative, that *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), supports the district court's "state action" determination. In *Shelley,* the Supreme Court found "state action" where private parties resorted to the state courts to enforce a *facially discriminatory* restrictive covenant which provided, *inter alia,* that "no part of said property ... shall be, for said term of Fifty-years, occupied by any person not of the Caucasian race, it being intended hereby to restrict the use of said property ... against the occupancy as owners or tenants of any portion of said property for resident or another purpose by people of the Negro or Mongolian Race." *Id.* at 4, 68 S.Ct. at 838. The residents insist that *Shelley* likewise encompasses judicial action to enforce a *facially neutral* covenant in a discriminatory manner.

▅ Two decades ago, this court propounded a clear limiting principle for applying the "state action" standard enunciated in *Shelley. See Lavoie v. Bigwood,* 457 F.2d 7, 11–12 (1st Cir.1972). Distinguishing *Shelley* from *Griffin v. Maryland,* 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), Judge Coffin aptly noted:

> In [*Griffin,*] a deputy sheriff had ordered certain black patrons to leave a privately-owned amusement park, had arrested them when they refused to do so, and had brought a prosecution for criminal trespass. The Court recounted Maryland's argument that it

---

**7.** The "state action" requirement may be met where (1) a sufficient financial or regulatory nexus exists between the private party and the state entity; (2) the private party has been delegated authority to conduct a public function traditionally within the exclusive prerogative of the State; or (3) the private party and the state entity share a symbiotic, interdependent relationship. *See Rodriguez–Garcia v. Davila,* 904 F.2d 90, 96–99 (1st Cir.1990). These grounds are neither suggested nor established in the present record.

may ... constitutionally enforce an owner's desire to exclude particular persons from his premises even if the owner's desire is in turn motivated by a discriminatory purpose. The State, it is said, is not really enforcing a policy of segregation since the owner's ultimate purpose is immaterial to the State....

The Court responded that such were not the facts of the case before it, in that "The president of the corporation which owned and managed the park testified that he had instructed [the deputy sheriff] to enforce the park's policy of racial segregation." A state, then, must be more strictly neutral than to permit any of its officers to identify the subjects of the discrimination in the first instance. Although it was not cited in *Griffin,* we take *Shelley* to be an earlier application of the same principle. To enforce the covenant and thereby disrupt a transaction between a willing seller and a willing buyer, the state court had necessarily to take evidence that the prospective buyer was black and to take notice that the clause being enforced was a racially restrictive one.

But while, on the facts of *Shelley* and *Griffin,* the Court had no occasion to announce a narrower theory indicating when a state police officer or court is "neutral" for the purposes of the Fourteenth Amendment, we think that, apart from cases involving racial discrimination, Maryland's argument suggests a workable theory. That is, *a state may at the behest of private persons apply sanctions pursuant to general rules of law which have discriminatory as well as non-discriminatory application if it does not accept the responsibility of employing a discriminatory classification. Such responsibility would exist when, in resorting to a state sanction, a private party must necessarily make the state privy to his discriminatory purpose. Similarly,* in such a case as this, *the state would retain a neutral posture unless it was necessarily apprised of the landlord's purpose to violate rights of free speech and associa-*tion. While not entirely satisfactory, this approach at least recognizes conscious state involvement without insisting upon an unattainable purity.

*Lavoie,* 457 F.2d at 11–12 (emphasis added) (citations omitted).

The residents have not established "state action" under the *Lavoie* "neutrality" principle. The zoning ordinances and the restrictive covenants are facially neutral, and presumptively valid under Puerto Rico law. Furthermore, the Casa Marie residents were not parties to the Superior Court action prior to the entry of the final judgment. Thus, it cannot be determined on any evidentiary basis that the Superior Court was either apprised of any discriminatory animus on the part of the neighbors, or asked to consider any discriminatory effect that the belatedly alleged selective enforcement of the zoning ordinances and restrictive covenants might occasion. Without indulging conjecture, therefore, it cannot be concluded that the Superior Court must necessarily have been made privy to any allegedly discriminatory design on the part of the neighbors. *See id.* at 12. Absent "state action," the district court should have dismissed the section 1983 claims as a basis for injunctive relief, and the Superior Court as a party-defendant.

### B. *The Fair Housing Act Claims.*

#### 1. Casa Marie and the Intervenors.

Unlike the nonintervenors, these federal plaintiffs attempted to litigate their federal claims in the district court, notwithstanding their continuing involvement in two pending Superior Court proceedings. In these circumstances, the district court should have abstained in deference to the proceedings pending in the Superior Court.

#### *a. The Anti–Injunction Act.*

██ The Anti–Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as *expressly authorized by Act of Congress,* or where necessary in aid of its jurisdiction, or

to protect or effectuate its judgments." 28 U.S.C. § 2283 (1990) (emphasis added). Appellants challenge the district court ruling that Title VIII is an "express" exception within the meaning of the Anti–Injunction Act. *See Casa Marie*, 752 F.Supp. at 1169–71. Asserting that neither the language of Title VIII, nor its legislative history, expressly authorizes a federal court to enjoin a state court proceeding, appellants argue that the Anti–Injunction Act constitutes an "absolute prohibition" on federal injunctive relief. *See, e.g., Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 297, 90 S.Ct. 1739, 1748, 26 L.Ed.2d 234 (1970) ("Any doubts as to the propriety of a federal injunction ... should be resolved in favor of permitting the state courts to proceed....").[8] We agree.

■ The Anti–Injunction Act is "an historical mechanism (Act of March 2, 1793, 1 Stat. 334, 335) for achieving harmony in one phase of our complicated federalism by avoiding needless friction between two systems of courts having potential jurisdiction over the same subject-matter." *Hale v. Bimco Trading, Inc.*, 306 U.S. 375, 378, 59 S.Ct. 526, 527, 83 L.Ed. 771 (1939). The three exceptions enumerated in the Act must be narrowly construed. *See Mitchum v. Foster*, 407 U.S. 225, 228–29, 92 S.Ct. 2151, 2154–55, 32 L.Ed.2d 705 (1972); *Atlantic Coast Line*, 398 U.S. at 298, 90 S.Ct. at 1748. While it is beyond dispute that the residents' *section 1983* claims come within an "express" exception to section 2283, *see Mitchum*, 407 U.S. at 240–41, 92 S.Ct. at 2161–62 (legislative history of section 1983 demonstrates obvious congressional distrust of state courts, which were often "in league with those who were bent upon abrogation of federally protected rights"), we are unable to discern any statutory language or legislative history which indicates that Congress expressly excepted Title VIII claims from the operation of the Anti–Injunction Act.

In *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), the Supreme Court prescribed a two-part analysis for determining whether a federal statute comes within the Anti–Injunction Act's "expressly authorized" exception: (1) the statute "must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity," and (2) the federal right or remedy must be such that it can be "given its intended scope *only* by the stay of a state court proceeding." *Id.* at 237–38, 92 S.Ct. at 2159–60 (emphasis added). We need only consider the second prong of the *Mitchum* test, *but cf. infra* note 16, which would seem to require some indication that Congress suspected that state courts, as a routine practice, would not vindicate Title VIII rights. *See, e.g., Zajac v. Federal Land Bank*, 909 F.2d 1181, 1195 (8th Cir.1990) (Agricultural Credit Act constitutes express exception, as it is aimed at eradicating "past abuses of state court foreclosure proceedings.").

Congress contemplated concurrent state-federal court jurisdiction over Title VIII claims. *See* 42 U.S.C. § 3613(a)(1)(A); *cf. General Motors Corp. v. Buha*, 623 F.2d 455, 459 (6th Cir.1980) (ERISA is an "express" exception because of its preemption and *exclusive* federal jurisdiction provisions); *Dilworth v. Riner*, 343 F.2d 226, 230–32 (5th Cir.1965) (Title II of Civil Rights Act of 1964 constitutes "express" exception, as it vests exclusive jurisdiction in federal courts); *Walling v. Black Diamond Coal Mining Co.*, 59 F.Supp. 348, 350 (W.D.Ky.1943) (Fair Labor Standards Act constitutes "express" exception; although jurisdiction is concurrent, injunctive relief is available *only in federal court*). *But see Total Plan Servs., Inc. v. Texas Retailers' Ass'n*, 925 F.2d 142, 145 (5th Cir.1991) (ERISA not "express" exception).

---

**8.** The Anti–Injunction Act bars federal court interference, whether by direct or *indirect methods,* in the parties' " 'utilization of the results of a completed state proceeding.' " *Gloucester Marine Rys. Corp. v. Charles Parisi, Inc.*, 848 F.2d 12, 15 (1st Cir.1988) (quoting *Atlantic Coast Line,* 398 U.S. at 287, 90 S.Ct. at 1743). Unless it appears that Title VIII constitutes an express authorization by Congress for overriding the Anti–Injunction Act, the district court could not avoid the needless federal-state court "friction" at the root of the Anti–Injunction Act's prohibition simply by precluding enforcement of the Superior Court judgment by enjoining the neighbors from executing their judgment. *Id.*

Without more, the vesting of concurrent jurisdiction would seem to imply a vote of confidence in the integrity and competence of state courts to adjudicate Title VIII claims. Significantly, unlike the situation in *Mitchum*, appellees cite no legislative history intimating that congressional mistrust of state courts figured however slightly in the enactment of Title VIII.

Appellees instead argue that Congress implicitly demonstrated mistrust of state and local *government in general* by enabling private litigants to sue for federal injunctive relief against municipalities which enact or enforce zoning ordinances in a discriminatory fashion. Their argument distends the Act's restrictive language ("*expressly* authorized by Act of Congress") to absurd limits. If *Mitchum's* second prong were to be considered satisfied whenever Congress enacted a statute authorizing injunctive relief, or by the mere fact that a local government *might* be made a defendant in a particular case, the rule requiring narrow construction of the Act's exceptions would be rendered largely meaningless, and with it the general presumption that state *courts* are competent to protect federal rights. *See Vendo Co. v. Lektro–Vend Corp.*, 433 U.S. 623, 636, 97 S.Ct. 2881, 2890, 53 L.Ed.2d 1009 (1977) (listing twenty-six federal statutes authorizing injunctive relief, and noting that such a blanket test would "eviscerate" the Anti–Injunction Act as a meaningful restraint on federal courts). Accordingly, we conclude that the Anti–Injunction Act barred federal injunctive relief in favor of Casa Marie and the intervenors.

## b. *Younger Abstention.*

■ Even assuming that Title VIII were to be considered an express exception to the Anti–Injunction Act, appellants argue that the district court should have abstained, in the interests of comity and federalism, from interfering with pending state court proceedings which implicate such vital state interests, *see Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971): namely, the Commonwealth's important stake in protecting the integrity of the contempt power as the ultimate means of ensuring compliance with the final judgments of its courts, *see Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), and of "vindicat[ing] [the State's interest in] the regular operation of its judicial system," *id.* at 335, 97 S.Ct. at 1217. Again, we agree.

■ Proper respect for principles of federalism and comity requires that federal courts, "anxious though [they] may be to vindicate and protect federal rights and federal interests, always endeavor[ ] to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger*, 401 U.S. at 44, 91 S.Ct. at 750. Except in the most extraordinary cases,[9] a federal court must presume that state courts, consistent with the imperatives of the Supremacy Clause, *see* U.S. Const. art. VI, are fully competent to adjudicate federal constitutional and statutory claims properly presented by the parties. *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431, 102 S.Ct. 2515, 2520, 73 L.Ed.2d 116 (1982); *Bettencourt v. Board of Registration in Medicine*, 904 F.2d 772, 776 (1st Cir.1990).[10] To obtain federal injunctive relief impeding

**9.** Extraordinary circumstances may be found, for example, where the state statute or rule under which the federal plaintiff is prosecuted or sued in state court is "flagrantly and patently violative of express constitutional prohibitions in every clause," or where the federal plaintiff demonstrates " 'bad faith [prosecution], harassment or any other unusual circumstances that would call for equitable relief.' " *Malachowski v. City of Keene*, 787 F.2d 704, 708 (1st Cir.), *cert. denied*, 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *Landrigan v. City of Warwick*, 628 F.2d 736, 743 (1st Cir.1980). As we have noted, appellees presented no evidence that the Superior Court acted in bad faith, or that the zoning ordinances or restrictive covenants were patently discriminatory. *See* Section II.A.

**10.** As a normal consequence, *Younger* abstention forces the parties to a state court proceeding to litigate federal claims and defenses through the state court system, with discretionary appellate review by the United States Supreme Court as a last resort. *See Juidice*, 430 U.S. at 337, n. 14, 97 S.Ct. at 1218, n. 14; *see also* 28 U.S.C. § 1257(2).

a pending state court proceeding, therefore, the federal plaintiff must surpass the normal showing of irreparable injury, and posit the existence of an irremediable harm both "great and immediate." *Younger*, 401 U.S. at 46, 91 S.Ct. at 751. Even if it were determined that plaintiffs successfully surmounted this heightened standard of proof, however, it would be to no avail; the district court failed to consider two paramount, countervailing factors: (*1*) the importance of the State interest at stake in the pending Superior Court proceedings, *see, e.g., Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 5, 13, 107 S.Ct. 1519, 1523, 1527, 95 L.Ed.2d 1 (1987) (abstention warranted where Texas' lien and bond provisions, permitting writs of execution to issue prior to exhaustion of state appeals, constitute an important process "by which the State compels compliance with the judgments of its courts"); *Trainor v. Hernandez*, 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977) (abstention warranted where pending state court civil action brought by State of Illinois to attach fraudulently obtained public assistance payments implicates important state interest in "safeguarding the fiscal integrity of [its] programs"); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975) (abstention warranted where State's prosecution of civil nuisance suit is analogous to its interest in criminal prosecution); *Juidice*, 430 U.S. at 335, 97 S.Ct. at 1217 (abstention warranted, as "[t]he contempt power lies at the core of the administration of a State's judicial system"); *Younger*, 401 U.S. at 46, 91 S.Ct. at 751 (abstention warranted in deference to pending state criminal prosecution), and (*2*) the availability of an adequate "opportunity" to raise the federal claims in the State court. *See Bettencourt*, 904 F.2d at 777; *Gabrilowitz v. Newman*, 582 F.2d 100, 102 (1st Cir.1978).

Given Casa Marie's undisputed disregard of the Superior Court's final judgment, and the unquestioned importance of the Commonwealth's interest in enforcing the judgments of its courts through civil contempt proceedings, *see Juidice*, 430 U.S. at 335, 97 S.Ct. at 1217; *see also Pennzoil*, 481 U.S. at 13, 107 S.Ct. at 1527 (State has important interest in preventing its judgments from being "rendered nugatory"); *cf. Lebbos v. Judges of Superior Court*, 883 F.2d 810, 814 (9th Cir.1989), we hold that the *Younger* doctrine barred Casa Marie and the intervenors from litigating their Title VIII claims in federal district court. As a party to the enforcement-contempt proceedings yet pending in the Superior Court, Casa Marie not only had ample opportunity, but an obligation, to raise its federal counterclaims in the Superior Court. *See* P.R. Laws tit. 32, App. III, R. 11.1 (a counterclaim is considered compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim").

The intervenors belatedly sought to participate in the same enforcement-contempt proceedings which remain pending in the Superior Court, then instituted the Superior Court lawsuit whose sole purpose is to restrain enforcement of the final Superior Court judgment and contempt decree against the Casa Marie owners. Apart from their unsubstantiated and conclusory allegation that a Superior Court judge stated *"off the record"* that she might be disinclined to restrain enforcement of a final judgment entered by a Superior Court colleague, the intervenors neither alleged nor presented any evidence (*e.g.*, an order denying their motion to intervene or dismissing their complaint) that they were precluded from pursuing either pending Superior Court action. Instead, so far as the present record indicates, the intervenors simply suspended their pursuit of the Title VIII claims in the pending Superior Court proceedings in favor of a fresh start in the federal court action aimed at enjoining enforcement of the final Superior Court judgment against Casa Marie.

We conclude that extraordinary injunctive relief indirectly suspending enforcement of the Commonwealth's judicial processes in the ongoing Superior Court proceedings, with its attendant depreciation of the fundamental principles underlying federalism and comity, was unwarranted. *See Moore v. Sims*, 442 U.S. 415, 426, 99 S.Ct.

2371, 2379, 60 L.Ed.2d 994 (1979) (abstention appropriate *"unless state law clearly bars* the interposition of [federal] claims") (emphasis added). After initiating a state court proceeding, a federal plaintiff cannot escape *Younger*'s reach merely by abandoning the pending state court action or foregoing available state appellate remedies, *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 369, 109 S.Ct. 2506, 2518, 105 L.Ed.2d 298 (1989); the "opportunity" to raise federal claims in a pending state court proceeding is enough to implicate *Younger* abstention. *Juidice,* 430 U.S. at 337, 97 S.Ct. at 1218. Thus, *Younger* abstention precluded the district court order indirectly enjoining the pending Superior Court contempt proceedings against Casa Marie and the intervenors.

### 2. The Nonintervenors.

The prudential considerations underlying the Anti–Injunction Act and *Younger* abstention require further searching inquiry in reference to the federal claims presented by the nonintervenors. The majority of cases in which federal courts abstain from enjoining pending state court proceedings involve federal plaintiffs who are actual parties to the state court proceedings. The nonintervenors were not involved in either pending Superior Court proceeding. As we have noted, however, *see supra* Section II.B.1.a., the state and federal courts possess concurrent jurisdiction under Title VIII, *see* 42 U.S.C. § 3613(a)(1)(A), offering Title VIII plaintiffs a choice of forum. Ultimately, therefore, the essential question becomes whether the nonintervenors waived or acquiesced in a waiver of the

right to present their Title VIII claims in the federal forum.

#### a. The Anti–Injunction Act.

■■■ Under the "strangers to the state court proceedings" exclusion,[11] the Anti–Injunction Act is inoperative if the party requesting injunctive relief in the federal court was neither a party, nor in privity with a party, to the state court proceeding sought to be enjoined. *See County of Imperial v. Munoz,* 449 U.S. 54, 59–60, 101 S.Ct. 289, 292–93, 66 L.Ed.2d 258 (1980); *Hale v. Bimco Trading, Inc.,* 306 U.S. 375, 378, 59 S.Ct. 526, 527, 83 L.Ed. 771 (1939); *Chase Nat'l Bank v. City of Norwalk,* 291 U.S. 431, 440, 54 S.Ct. 475, 479, 78 L.Ed. 894 (1934); *Garcia v. Bauza–Salas,* 862 F.2d 905, 909 (1st Cir.1988). The "strangers" exclusion presumably embraces federal plaintiffs who deliberately bypass an available opportunity to intercede in pending state court proceedings, since "[t]he law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger." *Chase Nat'l Bank,* 291 U.S. at 441, 54 S.Ct. at 479.[12] Neither Casa Marie nor the intervenors fit within the "strangers" exclusion, of course, but neither would their mere joinder with nonintervenors as federal plaintiffs necessarily deprive the nonintervenors of the exclusion. *See generally* Charles A. Wright, Arthur Miller, & Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction* § 4449, at 416 (1981) [hereinafter *Federal Practice* ] ("The bare fact that one plaintiff is joined with others who were parties and who can properly be bound by a prior proceeding does not justify preclusion of the nonparty plaintiff as well.") (citing *Dun-*

---

**11.** The district court did not mention the "strangers" exclusion as a basis for its decision. Nevertheless, its conclusion that *res judicata* did not bar their claims necessarily subsumed a determination that the nonintervenors were "strangers."

**12.** Generally speaking, intervention rules are permissive, while joinder rules are mandatory. Thus, in order to preclude future relitigation of claims arising out of the same transaction, a state court plaintiff would need to join all those whom he intends to bind by the judgment who are not in privity with the named defendants for

*res judicata* purposes. *See Professional Hockey Club Cent. Sports Club of the Army v. Detroit Red Wings,* 787 F.Supp. 706, 717 (E.D.Mich. 1992) (federal plaintiff's tactical decision not to waive personal jurisdiction in state court should not preclude its employment of "strangers" exclusion in subsequent federal action); *cf. Martin v. Wilks,* 490 U.S. 755, 761–65, 109 S.Ct. 2180, 2184–86, 104 L.Ed.2d 835 (1989); *see generally* Charles A. Wright, Arthur Miller, & Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction* § 4452, at 439–453 (1981).

*can v. Town of Blacksburg,* 364 F.Supp. 643, 645 (W.D.Va.1973)). The nonintervenors' status as "strangers" to these proceedings accordingly depends on whether they are bound, under the principles of *res judicata* or collateral estoppel, by the decisions in either pending Superior Court proceeding. *See, e.g., United States Steel Corp. Plan for Employee Ins. Benefits v. Musisko,* 885 F.2d 1170, 1179 (3d Cir.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990); *Pelfresne v. Village of Williams Bay,* 865 F.2d 877, 881 (7th Cir.1989).

■ Although it is highly questionable whether either intervenors or nonintervenors would be "bound" under *res judicata* principles by any judgment or contempt decree against the Casa Marie owners,[13] the common interests asserted by the intervenors and nonintervenors are virtually identical in all material respects. While we need not rest our decision solely on this ground, *see infra* Section II.B.2.b., we are convinced that the Commonwealth courts would treat the intervenors, by reason of their initiation of the independent Superior Court action to restrain enforcement of the contempt decree, as the "virtual representatives" of the nonintervenors' interests for *res judicata* purposes. *See, e.g., In re Medomak Canning,* 922 F.2d 895, 901 (1st Cir.1990); *see also* 28 U.S.C. § 1738 (federal court must accord state court judgment the same preclusive effect it would be given by the courts of that State); *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465

U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984) (same); *Rojas–Hernandez v. Puerto Rico Elec. Power Auth.,* 925 F.2d 492, 495 (1st Cir.1991) (same).[14]

We recognize, of course, that "it is not enough that [the federal plaintiffs'] concerns ... mirrored those which likely impelled [the earlier plaintiffs] to start suit in superior court," *Montalvo–Huertas v. Rivera–Cruz,* 885 F.2d 971, 975–76 (1st Cir. 1989) (citing *A & P Gen. Contractors, Inc. v. Asociacion Cana, Inc.,* 110 P.R. Dec. 753 (1981)), and that "virtual representation does not exist between two plaintiffs merely because they raise similar [factually-related] claims," *Terrell v. De Conna,* 877 F.2d 1267, 1271 (5th Cir.1989); *see also Diaz v. Naiveras,* 118 P.R.Dec. 297 (1987) (privity not established by familial relationship). Yet nonintervenors' federal complaint is distinctive in two significant respects—one substantive and one procedural. The nonintervenors' complaint hinges entirely on their proving that the neighbors harbored the alleged discriminatory intent to exclude the residents *as a group* from the JDA housing development; in no sense does it focus on any *particular resident* as an individual target of the alleged discrimination. Thus, whatever circumstantial differences may exist among individual Casa Marie residents are entirely irrelevant to the merits of their Title VIII claims. *Cf. Wilder v. Thomas,* 854 F.2d 605, 620 (2d Cir.1988) (holding that two nonparties were bound where all federal plaintiffs alleged imminent injury from lack of environmental impact study on construction project,

---

**13.** The only obvious connection between Casa Marie and its residents—the "landlord-tenant" relationship—might not generate a sufficient identity of interest, or privity, between the parties. As a general rule, holders of concurrent interests in property, unlike successors in interest, are not considered in privity for *res judicata* purposes. *Compare In re Corporacion de Servicios Medico–Hospitalarios,* 98 B.R. 639 (Bankr. 1989) (nonparty in privity where nonparty is a successor in interest or assignee of party to first action) *with Federal Practice* § 4461, at 542, 543 n. 3 (and cases cited therein).

**14.** Puerto Rico's *res judicata* statute, P.R. Laws Ann. tit. 31, § 3343, provides: "[i]n order that the presumption of the res judicata may be valid in another suit, it is necessary that, between the case decided ... and that in which the same is

invoked, there be the *most perfect identity between the things, causes, and persons* of the litigants, and their capacity as such." (Emphasis added.); *see also Futura Dev. Corp. v. Centex Corp.,* 761 F.2d 33, 43 (1st Cir.), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 121 (1985). "Perfect identity between persons," however, is not as absolute a term as may at first appear. Section 3343 further provides that "there is identity of persons whenever the litigants of the second suit are *legal representatives* of those who litigated in the preceding suit, *or* when they are *jointly bound with them* or by the relations established by the indivisibility of prestations among those having a right to demand them, or the obligation to satisfy the same." (Emphasis added.)

and the issues raised in the state and federal proceedings "do not vary according to individual plaintiffs"), *cert. denied,* 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989). Each Casa Marie resident, intervenor and nonintervenor alike, at all times had, *and still has,* ample incentive to litigate vigorously against the threatened injury to the federally protected interests common to all residents, namely the closure of Casa Marie.

No less importantly, the "virtual representation" inquiry in the present case arises in the context of a *post*-judgment proceeding.[15] Given the vital "finality" interests engendered by their valid judgments, we doubt very seriously that the Commonwealth courts would sanction successive attempts by individual Casa Marie residents to restrain the enforcement of the final Superior Court judgment—an unavoidable result, nonetheless, should individual residents be allowed successively to assert lack of privity in these circumstances. *See, e.g., Petit v. City of Chicago,* 766 F.Supp. 607, 611–12 (N.D.Ill.1991) (*res judicata* rules of "representation" should discourage tactical maneuvering by parties); *see generally* Restatement (Second) of Judgments § 62 (1981) (nonparty may be barred from relitigation of claim if, by his conduct, he induced justifiable expectation that he would "govern his conduct by the judgment in the original action").

■■■ We are particularly reluctant to extend the protection of the "strangers" exclusion in the present action, as it has been utilized so seldom by the Supreme Court that its continued vitality has even been questioned. *See, e.g., County of Imperial,* 449 U.S. at 60–61, 101 S.Ct. at 293–94 (Powell, J., concurring) ("I record my

willingness to reconsider *Hale.* It has rarely been cited and—as the Court reads it today—it creates an exception to the coverage of the Anti–Injunction Act that I think is contrary to the policy of that Act."). Moreover, withholding the "strangers" exclusion under the Anti–Injunction Act has less drastic repercussions for the federal plaintiffs than would a formal *res judicata* determination. Federal court *abstention* would not divest the federal plaintiffs of their right to litigate their Title VIII claims, but merely restrict them to the available Commonwealth forum. More importantly, of course, where the case for "virtual representation" is so compelling, and the effects of the "strangers" exclusion so obtrusive, the exercise of a federal court's narrowly confined power to enjoin a pending state court proceeding must be considered at its most suspect extension.[16]

### b. Younger Abstention.

■■■ Even assuming the nonintervenors were somehow to escape the strictures of the Anti–Injunction Act, we believe *Younger* abstention would prevent federal relief enjoining enforcement of the Superior Court *contempt decree.* In an apparent corollary to the "strangers" exclusion, the Supreme Court has intimated that *Younger* abstention might not apply in some instances to a federal plaintiff who was not a party, or not "closely related" to a party, in the pending state court proceeding. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 928–29, 95 S.Ct. 2561, 2566–67, 45 L.Ed.2d 648 (1975). "While there plainly may be some circumstances in which legally distinct parties are so *closely related* that they should all be subject to the *Younger* considerations which govern any one of them, this is not such a case." *Id.* (emphasis added); *see also Trainor,* 431 U.S. at

---

**15.** As with most general rules, an exception has been recognized to the no-duty-to-intervene rule in certain "specialized proceedings, such as bankruptcy, reorganization, or probate proceedings, where a party may be barred from future litigation by his mere failure to intervene." *Griffin v. Burns,* 570 F.2d 1065, 1071 n.' 7 (1st Cir.1978).

**16.** A *federal court* may abstain where a question relating to the proper interpretation of state law might resolve a pivotal issue in the federal case,

obviating the need to resolve the federal claims. *Pennzoil,* 481 U.S. at 11–12, 107 S.Ct. at 1526–27; *Duty Free Shop, Inc. v. Administracion De Terrenos,* 889 F.2d 1181, 1182 (1st Cir.1989). Intervenors attempted to intervene in the contempt proceeding based on a claim asserted under the Puerto Rico Bill of Rights for Aged Persons. If the nonintervenors were to be considered adequately "represented" by the intervenors, the Superior Court ultimately might rest its decision solely on the state-law claim.

440, 97 S.Ct. at 1916 (doctrine invoked only "when litigation *between the same parties and raising the same issues* is ... pending in a state court") (emphasis added); *Steffel v. Thompson,* 415 U.S. 452, 461–62, 94 S.Ct. 1209, 1216–17, 39 L.Ed.2d 505 (1974); *Roe v. Wade,* 410 U.S. 113, 125–27, 93 S.Ct. 705, 712–14, 35 L.Ed.2d 147 (1973); *Sullivan v. City of Pittsburgh,* 811 F.2d 171, 177–78 (3d Cir.) (federal plaintiffs not parties to ongoing zoning proceeding, and not sufficiently "related" to parties therein), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Family Div. Trial Lawyers v. Moultrie,* 725 F.2d 695, 702–03 (D.C.Cir.1984) (lawyers' federal "equal protection" and "takings" claims cognizable in federal court where lawyers not parties to state "neglect" proceedings); *Robinson v. Stovall,* 646 F.2d 1087, 1090–93 (5th Cir. 1981) (federal plaintiff with section 1983 claim never arrested or tried for violation of challenged statute). The distinction *Doran* draws between the terms "legally distinct" and "closely related" strongly suggests that *Younger*'s "close relationship" exclusion is far more narrow than the "strangers" exclusion under the Anti–Injunction Act, and may require federal plaintiffs who are not in strict privity to return to state court to litigate their federal claims where it is evident that their interests are sufficiently "intertwined" with the interests of parties to the state court proceedings. *Hicks v. Miranda,* 422 U.S. 332, 348–49, 95 S.Ct. 2281, 2291–92, 45 L.Ed.2d 223 (1975) (interests of theatre and its employees in challenging obscenity statute held to be closely related).[17]

We do not think the narrow exclusion described in *Doran* precludes *Younger* abstention in relation to these nonintervenors' Title VIII claims. First, *Doran* and much of its progeny involve state criminal or administrative proceedings which provide no procedural mechanism which would enable nonparties to intervene to protect their interests. *See, e.g., New Jersey–Philadelphia Presbytery of Bible Presbyterian Church v. New Jersey State Bd. of Higher Educ.,* 654 F.2d 868, 882 (3d Cir.1981) (where party is absolutely barred from intervention in state court proceedings, *Younger* abstention is never warranted).[18] Thus, such state criminal and administrative proceedings would not satisfy an essential element of the *Middlesex* test, which requires that the nonparties have a meaningful opportunity to raise their federal claims in the pending state court proceeding. *Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521. In the present case, we have no reason to doubt that nonintervenors, and intervenors alike, would be entitled under the Puerto Rico Rules of Civil Procedure to intervene as of right in the enforcement-contempt proceeding, and the nonintervenors to join in the intervenors' independent action. *See* P.R. Laws tit. 32, App. III, R. 21.1 (intervention allowed "when the applicant claims a right or interest relating to the property or transaction which is the subject of the action which may as a practical matter be impaired by the final disposition of the action"); *Chase Manhattan Bank v. Nesglo, Inc.,* 111 P.R. Dec. 767, 769 (1981) (noting liberality with which Rule 21 motions should be granted; unlike federal rule, applicants need not prove that their interests are not "adequately represented" by existing parties, and failed intervention lacks *res judicata* effect).

Second, unlike the *Doran*-type setting in which unrelated, legally distinct parties

---

17. Evolving Supreme Court abstention jurisprudence suggests that the principles underlying *Younger* abstention may ordain *more* deference to state court proceedings than the Anti–Injunction Act in some circumstances. For example, while section 1983 claims come within an "express" exception to the Anti–Injunction Act, such claims may still be subject to *Younger* abstention. *See Younger,* 401 U.S. at 54, 91 S.Ct. at 755.

18. For example, *Doran* involved a federal plaintiff's challenge to a state statute which was the subject of an ongoing *criminal* prosecution

against co-plaintiffs. Of course, nondefendants are barred from intervention in a criminal proceeding. While the federal plaintiff in *Doran* did not directly seek to enjoin the state criminal proceeding, interim federal relief would have had the effect of (1) "interfering" with the state prosecution and (2) depriving the state court of its ability to decide the merits of the federal defenses. *See New Jersey–Philadelphia,* 654 F.2d at 880 (*Doran* exclusion applies whether interference with state court proceeding is direct or indirect).

happen to mount separate but simultaneous legal challenges to the constitutionality of a state statute, the present case involves nonintervenor "co-lessees" with a common landlord, who took no action until after the Superior Court judgment was entered, even though they had actual knowledge that a Superior Court judgment threatened the very injury they now decry as patently collusive and "discriminatory."[19] Understandably, of course, the nonintervenors may have hoped that Casa Marie would prevail, obviating the need to litigate their Title VIII defenses. Even so, once again they delayed, while the neighbors obtained a contempt decree against Casa Marie. By delaying until so late in the litigation, intervenors and nonintervenors withheld defenses the presentation of which may well have aided the Superior Court in its evaluation of the neighbors' state-law claims and its determination of a measured remedy for Casa Marie's zoning law violations. More importantly, the nonintervenors' delay *until after entry of the contempt decree* necessarily meant that the district court, were it to grant the nonintervenors injunctive relief, effectively would be placed in the apparent position of actively condoning Casa Marie's contumacious disregard of the Superior Court judgment.

These grave concerns nonetheless do not, in our view, warrant depriving nonintervenors of the opportunity to assert their Title VIII claims in the Commonwealth courts. Rather, as a deterrent to future engenderment of needless federal-state court tensions, we conclude that nonintervenors should be held to have waived their belated claims for discretionary *federal* equitable relief enjoining the enforcement of the final Superior Court judgment.

Finally, we think it cannot reasonably be contended that nonintervenors' interests are no longer sufficiently "intertwined" with those of Casa Marie as to implicate

*Younger* abstention. *Cf. Collins v. County of Kendall,* 807 F.2d 95, 101–02 (7th Cir.1986) (plaintiff cannot simultaneously bring a claim which asserts that his interests are interconnected with other parties, then deny their close relationship for *Younger* purposes), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987). "[A] person who is not bound by a judgment under the rules of res judicata may obtain a determination that the judgment is ineffective as to him through an action to restrain enforcement of the judgment ... when ... [t]he existence of the judgment jeopardizes a protectible interest of his; and ... [t]he character of his interest warrants his being given relief forthwith rather than on a future occasion." Restatement (Second) of Judgments § 76 (1982). But though a nonjoined third party may rest assured that a final judgment by which he is not bound will not affect his *substantive* legal rights, he may not escape entirely the coincident implications attendant on the entry of the valid state court judgment, or the interests of the State in "vindicat[ing] the regular operation of its judicial system," *see Juidice,* 430 U.S. at 335, 97 S.Ct. at 1217.

> It is one thing for a stranger to attack a judgment when it is set up against him, another for him to be allowed to enjoin its enforcement or otherwise to initiate proceedings to have it declared invalid.... If the judgment really does threaten him, the question remains whether there are *competing interests to be considered, particularly the interests of the parties who are concededly bound by the judgment.* Giving the applicable legal relief from the effects of the judgment on him will not dissolve its legal effects on the parties to the judgment.

Restatement (Second) of Judgments § 76 cmt. c (1982) (emphasis added).

Once a valid judgment becomes final, so as to define the status quo, its enforcement

---

**19.** The nonintervenors, not having been joined in the neighbors' Superior Court complaint, probably could have chosen to press their federal claims in federal court prior to the entry of the judgment and contempt decree, subject only to the less imposing obstacle of *Colorado River* abstention. *See Colorado River Water Conserv.*

*Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (to avoid duplicative litigation, federal court may abstain from exercising concurrent jurisdiction over federal claims only in "exceptional circumstances"); *see also Rivera–Puig v. Garcia–Rosario,* 983 F.2d 311, 320 (1st Cir.1992).

is not precluded merely because the interests of those who seek to restrain its enforcement might be affected. Furthermore, absent unambiguous evidence that the state court rendered its final judgment in a discriminatory or otherwise impermissible manner, *see supra* Section II.A., prudential considerations normally will warrant federal court deference to the *state court's assessment* of any competing interests belatedly presented to the federal court which might warrant relief from the enforcement of the state court judgment.

We mention a relevant example. Title VIII does not require a showing that discriminatory intent was the sole factor, but rather a substantial factor motivating defendants' conduct. *See, e.g., United States v. Birmingham,* 727 F.2d 560, 562 (6th Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir.1982).[20] On the other hand, no liability arises under Title VIII absent a sufficient causal link between the defendants' discriminatory actions and the threatened in-

jury to the plaintiffs. *See, e.g., Gomez v. Chody,* 867 F.2d 395, 401 (7th Cir.1989) (where apartments would have been closed anyway because unfit for habitation, alleged discriminatory purpose of landlord in evicting was too attenuated); *see also Edwards v. Johnson County Health Dep't.,* 885 F.2d 1215, 1221 n. 14 (4th Cir.1989). In the present case, nonintervenors allege that the neighbors' actions, motivated by a discriminatory animus against "persons of a handicap," were the cause of Casa Marie's closure, even though they must also concede that, at the time of the Superior Court judgment, Casa Marie's noncompliance with the zoning laws was an additional, antecedent, and efficient cause for the entry of the adverse judgment against Casa Marie.[21] To enforce a zoning ordinance under P.R. Laws Ann. tit. 23, § 71x, 72 (1987), a private citizen apparently need only show that the defendant has violated the zoning laws. *See supra* note 3. In contrast, the district court's consideration of the federal plaintiffs' request for injunctive relief immersed the court in specula-

20. Four considerations are pertinent to the evaluation of Title VIII claims under section 3604. First, plaintiff has the threshold burden to show a discriminatory effect or impact—that the housing practice "actually or predictably results in discrimination as defined under section 3604," *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d at 933, 934; *United States v. City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), or results in a disproportionate burden on members of a class protected by Title VIII. *Edwards v. Johnson County Health Dep't.,* 885 F.2d 1215, 1223 (4th Cir.1989). Second, although *direct* proof of the defendant's discriminatory intent is not essential for purposes of Title VIII, *see, e.g., Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1533 (7th Cir.1990); *Huntington Branch,* 844 F.2d at 934; *United States v. Starrett City Assocs.,* 840 F.2d 1096, 1100 (2d Cir.), *cert. denied,* 488 U.S. 946, 109 S.Ct. 376, 102 L.Ed.2d 365 (1988); *Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 986 (4th Cir.1984); *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1036 (2d Cir.1979), plaintiff may *bolster* the evidence of discriminatory effect by introducing direct evidence, such as statements made by the defendant, that the defendant acted out of a discriminatory animus. Third, once the plaintiff has established a *prima facie* case of discriminatory effect, the burden shifts to the defendant to advance some legitimate and nondiscriminatory reason for his actions. *See, e.g.,*

*Asbury v. Brougham,* 866 F.2d 1276, 1279 (10th Cir.1989); *Huntington Branch,* 844 F.2d at 933; *Robinson,* 610 F.2d at 1039. And fourth, the factfinder must weigh the evidence of discriminatory effect or intent against the proffered justifications for the defendant's actions. In this balancing process, the court must consider the *type* of relief sought by plaintiff. Where plaintiff seeks a judgment which would require defendant to take affirmative action to correct a Title VIII violation, plaintiff must make a greater showing of discriminatory effect. On the other hand, if plaintiff seeks a judgment merely enjoining defendant from further interference with the exercise of plaintiff's Title VIII rights, a lesser showing of discriminatory effect would suffice. *See Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

21. Although the Superior Court noted that Casa Marie would remain in violation of the JDA restrictive covenants even if A.R.P.E. later excused Casa Marie's noncompliance with the zoning ordinances, nothing in its opinion intimates that the zoning violations were not deemed *independent* grounds for the closure. Appellees contended at oral argument that they had cured their zoning violations subsequent to the entry of the district court's permanent injunction. In our view, however, the district court impermissibly involved itself in the speculative inquiry

tion as to whether the Superior Court, in assessing the threat posed by Casa Marie's continued operation,[22] would compel closure *irrespective* of any discriminatory intent on the part of the neighbors.[23]

We do not lightly conclude that there was an implied waiver of nonintervenors' statutory right to assert their Title VIII claims in a federal forum. Nevertheless, their delay in resorting to the federal forum until the Superior Court contempt decree had been entered cannot be countenanced without encouraging the very sort of egregious intrusion upon state judicial power which *Younger* abstention was designed to avert. *See supra* Section II. B.1.b.

## III

## CONCLUSION

We vacate the permanent injunction restraining the neighbors' enforcement of the Superior Court judgment and their enforcement of the outstanding contempt decree against Casa Marie. As our abstention ruling rests on the assumption that the residents will be accorded an adequate "opportunity" to participate in the Commonwealth proceedings, however, we anticipate that the Superior Court, as it has to date— out of respect for the principles of comity and federalism—will defer further enforcement of its judgment and contempt decree, for such reasonable time as it may allow, to

whether Casa Marie would (or could) bring itself into compliance with the zoning ordinances after entry of the Superior Court judgment. Once again, prudential considerations militated strongly in favor of deferring to the Superior Court as the more appropriate forum in which to present *evidence* and consider any unadjudicated claims for injunctive relief from the enforcement of the final Superior Court judgment.

22. The Superior Court is in the optimal position to adjudge whether compliance with the zoning ordinances should be "waived." Discrimination against handicapped persons is specifically defined for purposes of section 3604(f)(3) as (A) "a refusal *to* permit, at *the* expense of the handicapped person, *reasonable modifications* of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises," and (B) "a refusal to make *reasonable accommodations* in *rules, policies, practic-*

permit the filing and consideration of the residents' motions to intervene in the enforcement proceeding, or in the alternative, to permit intervenors to prosecute their independent action.

*The district court judgment is vacated. Judgment shall enter for appellants on appellees' section 1983 claims. Double costs are awarded against Casa Marie and its owners.*

## FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff, Appellee,

v.

## LONGLEY I REALTY TRUST, et al., Defendants, Appellees,

## Angeline A. Kopka, et al., Defendants, Appellants.

### No. 92–1770.

United States Court of Appeals, First Circuit.

Heard Dec. 7, 1992.

Decided March 10, 1993.

*es, or services,* when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling...." 42 U.S.C. § 3604(f)(3)(A)–(B) (emphasis added). Section 3604(f)(9) prescribes a limitation on the required "reasonable accommodation," providing that "[n]othing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or *whose tenancy would result in substantial physical damage to the property of others.*"

23. We cannot ignore the possibility that the Superior Court may find that *two* substantial *causes contributed to Casa Marie's closure.* It might ultimately determine that Casa Marie's noncompliance with the zoning laws requires closure, but that the neighbors nevertheless are liable in damages to Casa Marie's residents for resorting to the zoning laws and the restrictive covenants for discriminatory purposes. We be-

William E. Aivalikles, Nashua, NH, for appellants.

E. Whitney Drake, Sp. Counsel, with whom Ann S. DuRoss, Asst. Gen. Counsel, and Richard J. Osterman, Jr., Washington, DC, Sr. Counsel, F.D.I.C., were on brief for appellee F.D.I.C.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

lieve these matters are suitably left to the Commonwealth courts.